Linda HILBURN, Plaintiff-Appellant,

v.

MURATA ELECTRONICS NORTH AMERICA, INC., Murata Erie North America, Inc., Defendant-Appellee.

No. 98-9313.

United States Court of Appeals,

Eleventh Circuit.

July 20, 1999.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:96-cv-3147-ODE), Orinda D. Evans, Judge.

Before ANDERSON, Chief Judge, RONEY, Senior Circuit Judge, and COOK[*], Senior District Judge.

COOK, Senior District Judge:

The Appellant, Linda Hilburn, appeals from the granting of a summary judgment in favor of the Appellee, Murata Electronics North America, Inc. (Murata), on her claims under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213. *Hilburn v. Murata Elecs. N. Am.,* 17 F.Supp.2d 1377 (N.D.Ga.1998). Hilburn alleges that Murata (1) failed to promote or transfer her, (2) wrongfully terminated her employment, and (3) declined to rehire her because of her disability or the disabilities of her family. The trial court found that Hilburn had not created a genuine issue of a material fact concerning whether she, her son, or husband were disabled within the meaning of the ADA. It also concluded that Hilburn was not qualified for the positions that she sought to obtain due to a record of extensive absences from work that had been occasioned by her own health problems and those of her family. For the reasons that have been set forth below, we affirm.

I.

Hilburn began working at Murata on February 8, 1976 as a machine operator at the Company plant in Rockmart, Georgia. Several years later she was reclassified as a material control coordinator. By all

[*]Honorable Julian Abele Cook, Jr., Senior U.S. District Court Judge for the Eastern District of Michigan, sitting by designation.

accounts, she was considered to be a good employee who received favorable performance appraisals despite a continuing concern by the Company over her extensive absenteeism record.

The difficulties that Hilburn experienced in attending work on a regular basis began when her son was diagnosed with a brain stem tumor on June 2, 1988.[1] At a later time during the same year, her husband was diagnosed with acute pancreatitis. Soon thereafter, he became a diabetic as a result of the partial removal of his pancreas, which permanently prevented him from performing many major life activities. In the fall of the following year, Hilburn suffered a heart attack and was diagnosed with coronary heart disease, which allegedly caused her to have a decreased tolerance for lifting, running, and performing essential manual tasks.

As a result of Hilburn's efforts to attend to her own health problems, as well as those of her family, she was absent from work for approximately one hundred days between June 1988 and February 1989, thirty-eight days during the months of October, November, and December in 1989, fourteen days in 1990, thirteen days in 1991, and fifteen days in 1992. With recognition of Hilburn's personal problems, Murata never denied any of her requests to be absent from work.[2] The Company also granted discretionary leaves of absence to her despite having an attendance policy that placed a limitation on the number of paid sick days and the option for discretionary leaves of absence. These policies also allowed Murata to (1) initiate discipline for any reason, including illness-related absences, against those employees who had more than five absences during any six-month period, and (2) consider an employee's attendance record when reviewing job performance and transfer or promotion decisions.

On January 4, 1993, Hilburn, reacting to a rumor of a possible reduction among the staff at the Company, applied for a position as a material control expediter at Murata's corporate headquarters in Smyma, Georgia, believing that the job responsibilities were essentially the same as her then-current position. One

---

[1]As a result of the tumor and its treatment, Hilburn's son continues to suffer memory, attention, and learning problems, as well as a hearing loss for which he wears bilateral hearing aids.

[2]Nevertheless, Hilburn's attendance was noted to be a problem in the annual reviews that she received during 1991 and 1992.

of her supervisors, Fred Smith, agreed. He also recommended Hilburn for the position, citing her experience and performance within the material control department, as well as her knowledge of the computer system, as bases for his opinion. Although Smith noted some "concern" about her attendance record because the "[i]llness and sickness to herself and family members have caused her to be out from her job,"[3] it was his view that these personal problems would not inhibit her ability to perform the work assignments.

However, Taku Katayama, the head of the department in which the material control expediter position was located, did not completely agree with Smith. He believed that differences in the two jobs did exist because the material control expediter position required more forecasting and aggressiveness in meeting the needs of customers than that of a material control coordinator. Moreover, he denied having received Smith's recommendation, but acknowledged that Bob Entrekin, Murata's Vice-President for Human Resources, had told him of Hilburn's "attendance problem."

During his deposition, Katayama asserted that he had selected Michelle Haase for the material control expediter position because of his belief that (1) regular attendance was an important requirement for this job, and (2) Haase was the best qualified candidate, having obtained a college degree[4] and proved her aptitude while working in the same position as a temporary employee under his supervision. He also acknowledged that Hilburn's seventeen years of experience with the Company would have been an important consideration for him in his evaluation of the candidates for the material control expediter position. However, he indicated that Hilburn had not been given an interview because of her attendance record.

On March 11, 1993, Hilburn applied for an open customer service position at the Smyrna facility. Although this position was significantly different from her responsibilities as a material control coordinator, Smith supported her candidacy with a recommendation that included his concern about her attendance record.

---

[3]Hilburn Dep., Ex. 12.

[4]Hilburn, who does not possess comparable formal educational qualifications as Haase, maintains that the listed requirements for the material control expediter position did not include a college degree. Nevertheless, Katayama submits that Murata strove to hire college graduates in the belief that they possessed greater potential than those persons without a degree.

3

Hilburn was not selected for this position. Rather, another individual was selected because, in the judgment of Murata, the successful candidate possessed a college degree, as well as experience in customer service.

On March 26, 1993, Hilburn was given a layoff notice, which Murata insists was an integral part of an ongoing downsizing effort that began in 1992. Smith claims to have eliminated Hilburn's position because of his belief that her duties could be easily divided into three distinct functions, a division which could not be readily accomplished with the other employees within his department.[5] Between 1992 and 1993, the reduction in the work force at Murata resulted in the layoffs of half of the fifty-two non-production employees at Rockmart. Although Murata found jobs for virtually all of these non-production employees who had been laid off,[6] there is no evidence that the Company attempted to transfer Hilburn into another position after her layoff.

Less than two months after her layoff, Hilburn accepted a temporary position at Murata as a literary fulfillment clerk, a job that she retained until July 1993. While there, she submitted another application for an opening as a material control expediter. Her supervisor at the time, Mary Akin, recommended Hilburn for the position, stating that (1) she had all the necessary qualifications, and (2) her need for additional training was "practically nil."[7] However, Katayama selected another temporary employee, Katie Connell, under circumstances that were substantially identical to those that had previously led him to select Haase over Hilburn.

Unaware of Murata's decision to hire Connell, Hilburn telephoned Pam Quarles in the Human Resources Department to inquire about the status of her application. According to Hilburn, she was told by Quarles (1) "Sorry, Linda, but you know you have a sick family; you're potentially an attendance problem,"

---

[5]One of Hilburn's supervisors at the time, Lynn Bailey, confirmed that Hilburn's position was one of a few whose duties could have been easily divided. By the same token, Bailey testified that the Company continued to have a need for the duties that Hilburn had been performing.

[6]The one exception was an individual who secured employment elsewhere.

[7]Hilburn Dep., Ex. 12

and (2) that an interview was not extended to her because of Smith's reference to her attendance problems in his recommendation forms.[8]  After further unsuccessful attempts to contact Quarles, Hilburn spoke with Entrekin by telephone and taped the conversation, during which she was advised that her attendance was a factor in her failed promotion and transfer attempts at Murata.  Later, Entrekin wrote a "Memo to File" on July 7, 1993, in which he represented that Hilburn had been informed by him that "there was no one eliminating factor in her past record" that caused Katayama to reject her application, but rather that her application had been rejected because of "a comparison of overall qualifications."[9]

On August 30, 1993, Hilburn filed a discrimination charge against the Company with the Equal Employment Opportunity Commission (EEOC) based on her sex, disability, or association with family members who had disabilities.  Aware of this discrimination charge, Murata contacted Hilburn about a permanent job opening for a "stock boy" position in the Company's warehouse in Rockmart, Georgia. Hilburn declined to accept the position, asserting that she would be unable to perform the work assignments because of her disability.  However, Murata maintains that Hilburn, despite having been offered an interview for the Rockmart warehouse position, declined the invitation because of a belief that her temporary position as a medical secretary would become permanent.

On January 10, 1994, Hilburn was contacted once again by Murata about an interview for an open position in the Company's production control department.  This offer was rejected by Hilburn, who had secured full-time employment at the Floyd County Medical Center.[10]  On the following day, Murata

---

[8]Hilburn Dep. at 91, 131.

[9]Hilburn Dep., Ex. 13.

[10]Both parties agree that Hilburn, in declining this offer of an interview, knowingly waived all of her recall rights according to the policies of the Company.

forwarded a letter to Hilburn, in which she was officially notified of her termination of employment from the Company.[11]

On August 30, 1996, the EEOC issued a Right to Sue letter to Hilburn. On November 27, 1996, this litigation against Murata was initiated.[12]

II.

This tribunal reviews a decision by a trial court to grant a summary judgment on a de novo basis, and applies the same legal standards as those used by the trial court. *Harris v. H & W Contracting Co.,* 102 F.3d 516, 518 (11th Cir.1996). The legal conclusions of the lower court are given de novo review while the factual issues are resolved with all reasonable inferences being drawn in favor of the non-movant below. *Sammons v. Taylor,* 967 F.2d 1533, 1538 (11th Cir.1992); *Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.,* 818 F.2d 1530, 1532 (11th Cir.1987).

The moving party has the burden of demonstrating that there is no genuine issue as to any material fact, and a summary judgment is to be entered if the evidence is such that a reasonable jury could find only for the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 250, 106 S.Ct. 2505. Thus, a party, who is faced with a properly supported summary judgment motion, is obligated to come forward with extrinsic evidence which is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" in order to avoid the entry of a summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(e).

---

[11]This position was subsequently filled by a Murata employee who had been laid off on the same day as Hilburn.

[12]Hilburn initially included a sex discrimination charge against Murata in her original Complaint. However, this claim was subsequently withdrawn by her and is no longer at issue.

In assessing a summary judgment motion, the court must examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the non-moving party. Fed.R.Civ.P. 56(c); *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Pritchard v. Southern Co. Servs.,* 92 F.3d 1130, 1132 (11th Cir.), *amended in part on reh'g by* 102 F.3d 1118 (11th Cir.1996). Thus, the court must "avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 919 (11th Cir.1994). It is not the role of the court to weigh the facts. *Hairston,* 9 F.3d at 919. Rather, the determination is of "whether ... there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. The mere existence of a scintilla of supporting evidence is insufficient. *Id.* at 252, 106 S.Ct. 2505.

III.

The ADA mandates that employers shall not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims. *See Moses v. American Nonwovens, Inc.,* 97 F.3d 446, 447 (11th Cir.1996). Thus, Hilburn has the burden of proving a prima facie case of disability discrimination by a preponderance of the evidence, which requires a demonstration that she (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of her disability. 42 U.S.C. §§ 12112(a); *see Morisky v. Broward County,* 80 F.3d 445, 447-49 (11th Cir.1996). Having concluded that Hilburn had not established any genuine issue of a material fact relating to the first prima facie factor of disability, the trial court did not address the last two factors. *See Hilburn,* 17 F.Supp.2d at 1383. Therefore, we will limit our discussion to whether Hilburn can be considered disabled within the meaning of the ADA.

The ADA defines a "qualified individual with a disability" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Additionally, Hilburn must establish that Murata had actual or constructive knowledge of the disability or considered her to be disabled. *Morisky,* 80 F.3d at 448.

The ADA defines a "disability" as:

(A)     a physical or mental impairment that substantially limits one or more of the major life activities of an individual;

(B)     a record of such impairment;  or,

(C)     being regarded as having such impairment.

42 U.S.C. § 12102(2). Hilburn must be deemed to be "disabled" for purposes of the ADA if she satisfies any one of these three definitions. However, a physical impairment alone is not necessarily a disability under the ADA. *Pritchard,* 92 F.3d at 1132. Commentary to the federal regulations contains a non-exclusive list of conditions that constitute a physical impairment. For the purposes of Hilburn's personal disability claim, it is significant that heart disease is included in this listing. 45 C.F.R. pt. 84, App. A., subpart (A)(3) (1997). Courts, including the Eleventh Circuit Court of Appeals (Eleventh Circuit), frequently look to EEOC regulations to assess the next analytical step of determining whether a physical impairment substantially limits a major life activity. *See, e.g., Gordon v. E.L. Hamm & Assocs., Inc.,* 100 F.3d 907, 911 (11th Cir.1996).

These regulations explain that the term "substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."[13] 29 C.F.R. §§ 1630.2(j)(1)(i), (ii) (1997). Major life activities are

---

[13]Courts are instructed to consider the following three factors when determining whether an impairment substantially limits a major life activity:  (1) the nature and severity of the impairment;  (2) the duration or expected duration of the impairment;  and (3) the permanent or long term impact, or the

defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(*i* ) (1997). With respect to the major life activity of working, the regulations explain that the term "substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i) (1997).

Hilburn contends that the trial court erred in concluding that she was not disabled within the meaning of the ADA. Rather, Hilburn urges this Court to determine that she qualifies as a protected disabled person under the ADA pursuant to any of the three disability tests codified at 42 U.S.C. § 12102(2). We will examine each of these in turn.

(A)

Hilburn argues that she is disabled under the ADA by virtue of a coronary heart disease because it substantially limits her performance of the major life activities of running, performing manual tasks, lifting, and working. *See* 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(*i* ) (1997); 29 C.F.R. pt. 1630, App. § 1630.2(*i* ) (1997). The totality of evidence that Hilburn has produced on this point consists of the following facts: (1) following her heart attack in 1989, she was diagnosed with coronary heart disease, (2) an opinion by her treating physician, Dr. Brenda Budlong, who avers that "[a]s a result of the [heart attack] and coronary heart disease, [Hilburn] suffered and continues to suffer a diminished activity tolerance for normal daily activities such as lifting, running and performing manual tasks" and "Hilburn's [heart attack] and coronary heart disease substantially limit the major life activity of performing manual tasks,"[14] and (3) Hilburn's deposition testimony that a physician had imposed a ten pound lifting restriction upon her. We believe that

expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

[14]R.27, Budlong Aff. WW 4, 5.

9

the trial court was correct in concluding that this evidence failed to establish that Hilburn suffers from a disability within the meaning of the ADA.

There is no question that heart disease constitutes a physical impairment under the ADA. 45 C.F.R. pt. 84, App. A., subpart (A)(3) (1997). However, in order to constitute a disability within the meaning of the statute, a physical impairment must "substantially limit[ ] one or more of the major life activities of an individual." 42 U.S.C. § 12102(2)(A). As we explain below, even when viewing the evidence in the light that is most favorable to Hilburn, she has not demonstrated that her heart disease has substantially limited any of her major life activities, which she identifies as (1) running, (2) performing manual tasks, or (3) lifting or working.

Although not explicitly listed in the implementing regulations, we will assume for the purposes of this appeal that running qualifies as a major life activity. *See* 29 C.F.R. § 1630.2(*i* ) (1997) (walking is major life activity); 29 C.F.R. pt. 1630, App. § 1630.2(*i* ) (1997) (list of enumerated major life activities is not exhaustive). Unfortunately for Hilburn, there is an inadequacy of evidence in this record to prove that she is substantially limited in this activity. In her own deposition testimony, she answered "[y]es" to the question "can you walk and run?"[15] Her own counsel engaged in no deposition questioning in an effort to clarify this testimony or otherwise rehabilitate Hilburn. Although Dr. Budlong asserts that Hilburn has a "diminished activity tolerance for ... running," this conclusory statement is insufficient to create a genuine issue of a material fact. This affidavit is devoid of any specific facts whatsoever which support the conclusion that Hilburn's ability to run is substantially limited,[16] apart from the conclusory reference to her heart attack in 1989 and the subsequent coronary heart disease diagnosis. "[C]onclusory allegations without specific

---

[15]Hilburn Dep. at 54.

[16]Although the adequacy of Dr. Budlong's assertion that Hilburn suffers a "diminished activity tolerance" for running is questionable since it appears that this phrase is not necessarily equivalent to being "substantially limited," we will presume, for the purposes of Murata's summary judgment motion, that these two standards are essentially equivalent due to our mandate to draw all reasonable inferences in Hilburn's favor.

supporting facts have no probative value." *Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir.1985). Hence, it is our conclusion that the trial court correctly concluded that she had not created a genuine issue of a material fact concerning whether her coronary heart disease substantially limits the major life activity of running.

Similarly, there is an insufficient amount of evidence with which to establish that Hilburn is substantially limited in the major life activity of performing manual tasks. In response to deposition questions, Hilburn answered in the affirmative when asked if she can "walk and run," "sit and stand," "sleep and eat," "bathe," "dress," "write with a pencil and pen," "work around the house," "cook," and "work."[17] In response to the follow-up question, "other than lifting, what is it that you cannot do," Hilburn responded "that's [i.e., lifting] the only thing I've been told I can't do."[18] Hilburn does not identify, specifically or by class, any of the manual tasks that she is unable to perform. In the face of this evidence, Hilburn relies only upon the conclusory statement within the affidavit of Dr. Budlong, who opined that her patient is substantially limited in performing manual tasks. However, the absence of any specific facts which would substantiate Dr. Budlong's conclusion deprives this medical diagnosis of any probative value. *Evers,* 770 F.2d at 986. Therefore, the record is devoid of any extrinsic evidence that would create a genuine issue of a material fact concerning whether she is disabled on the basis of being substantially limited in her ability to perform manual tasks.

Finally, Hilburn cannot prevail on a claim that Murata discriminated against her in violation of the ADA due to her alleged substantial impairment in the major life activities of lifting or working. Hilburn testified during a deposition that she was advised by her physician not to lift more than ten pounds,[19] which is buttressed by Dr. Budlong's affidavit stating that she has a "diminished activity tolerance" for lifting.

---

[17] *Id.* at 54-55.

[18] *Id.* at 56.

[19] *Id.* at 55.

11

Hilburn also submits that this limitation results in her being substantially impaired in the major life activity of working because it has the practical effect of precluding her from engaging in an entire class of jobs, such as those which require heavy lifting. However, this argument is belied by her deposition testimony, in which she responded "[y]es" to the question "[a]nd you're able to work?"[20]

Turning to Hilburn's lifting argument, and assuming that the trial court erred in concluding that this impairment did not constitute a disability under the ADA, Hilburn has still failed to establish a prima facie ADA case. There is no evidence in the record which supports her argument that she was subjected to unlawful discriminatory conduct by Murata because of a lifting disability.

(B)

Hilburn also submits that she is disabled under the ADA because Murata had a documented record of her impairment as a result of having approved her medical leaves of absence. *See* 42 U.S.C. § 12102(2)(B). The relevant regulation defines "record of such impairment" as meaning that a person "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k) (1997).

> The intent of this provision, in part, is to ensure that people are not discriminated against because of a history of disability....
>
> This part of the definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment.... There are many types of records that could potentially contain this information, including but not limited to, education, medical, or employment records.

29 C.F.R. pt. 1630, App. § 1630.2(k) (1997). In rejecting Hilburn's position on this point, the trial court below concluded that she had not furnished any evidence that Murata had any record of a mental or physical impairment which substantially limited one or more of her major life activities. *Hilburn,* 17 F.Supp.2d at 1382. We find no error.

---

[20]*Id.*

12

Regardless of whether Hilburn is proceeding under a classification or a misclassification theory, the record-of-impairment standard is satisfied only if she actually suffered a physical impairment that substantially limited one or more of her major life activities. "The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities." 29 C.F.R. pt. 1630, App. § 1630.2(k) (1997); *Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 645 (2d Cir.1998); *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 510 n. 7 (7th Cir.1998); *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1120-21 (5th Cir.1998).

As explained in the preceding section, Hilburn has not established in this record that (1) the residual effects of her heart problems substantially limited her ability to engage in the major life activities of running or performing manual tasks, or (2) she was subjected to unlawful acts of discrimination by Murata because of a lifting restriction. Having failed to establish a substantial limitation in these major life activities, Hilburn's only remaining theory is that she is substantially limited in the major life activity of working. *See* 29 C.F.R. pt. 1630, App. § 1630.2(j) (1997) (individual's ability to perform major life activity of working should be considered only if no substantial limitation with respect to any other major life activity has been established). However, since Hilburn has not demonstrated any substantially limiting residual effects from her heart problems, her thirty-eight day absence from work between October 1989, when she suffered her heart attack, until December 1989 is an insufficient amount of time to support a claim that she was substantially limited in the major life activity of working. *See Colwell,* 158 F.3d at 646 (one month hospital stay followed by six month home recuperation, coupled with non-particularized and unspecific limitations upon return to work, did not constitute substantial impairment in ability to work); *Sanders v. Arneson Prods.,* 91 F.3d 1351, 1354 (9th Cir.1996) (three and a half month impairment with minimal residual effects not substantially limiting); 29 C.F.R. pt. 1630, App. § 1630.2(j) (1997) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities"). It follows that her subsequent absences of fourteen, thirteen, and fifteen days during 1990, 1991, and 1992, respectively,

13

were also insufficient to constitute a substantial limitation upon her ability to work within the meaning of the ADA. Contrary to Hilburn's argument, *Pritchard,* which has been cited by her as being supportive of her contention that she satisfies the record-of-impairment standard, is distinguishable. In *Pritchard,* the plaintiff succeeded in creating a genuine issue of a material fact concerning whether she was substantially limited in a major life activity, whereas Hilburn has failed to do so in the case at bar. *See Pritchard,* 92 F.3d at 1133-34.

(C)

Hilburn also argues that she is entitled to ADA protections because Murata regarded her as being disabled. 42 U.S.C. § 12102(2)(C). Such a person is defined by the statute as one who "(1) has an impairment that does not substantially limit a major life activity, but is treated by an employer as though it does; (2) has an impairment that limits a major life activity only because of others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a disability as recognized by the ADA." *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1327 n. 2 (11th Cir.1998) (citing 29 C.F.R. § 1630.2(*l*)). As with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of the individual. *Standard,* 161 F.3d at 1327. The trial court ruled that Hilburn had offered no evidence that Murata treated her as if she had suffered from a substantially limiting impairment. It found that the parties' proffer of evidence relating to Hilburn's attendance record neither suggests nor indicates that Murata regarded her as being disabled. *Hilburn,* 17 F.Supp.2d at 1382-83. We find no error.

Between the 1989 onset of Hilburn's heart problems and January 1993 when she first applied for a different position at Murata, no evidence of discrimination is available because she "continued to perform the same or similar work that [she] had previously performed." *Gordon,* 100 F.3d at 913. Although Hilburn maintains that her applications for transfer or promotion from January 1993 onward were rejected due to disability discrimination, the trial court correctly found that the evidence did not support such a conclusion. In support of her position on this issue, Hilburn notes that her record of absenteeism was a factor upon which

14

Murata relied in order to reject her applications for transfer. But the undisputed facts establish that (1) Hilburn did have an attendance problem, having missed approximately 180 work days between 1988 and 1992, and (2) Murata maintained an employee policy which authorized the Company to consider paid or authorized absences, including those related to sickness, when making transfer or promotion decisions. Therefore, Murata's recognition of Hilburn's attendance history does not support her argument that she was subjected to unlawful discriminatory decisions by the Company because of a perceived disability. Where a "defendant's recognition of plaintiff's limitations was not an erroneous perception, but instead was a recognition of a fact," *McCollough v. Atlanta Beverage Co.,* 929 F.Supp. 1489, 1498 (N.D.Ga.1996), "a finding that plaintiff was regarded as disabled and, therefore, [is] entitled to the protections of the ADA[,] is inappropriate," *Bute v. Schuller Int'l Inc.,* 998 F.Supp. 1473, 1477 (N.D.Ga.1998).

IV.

The ADA also defines the term "discriminate" to include, among other factors, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). In order to establish a prima facie case under this "association discrimination" theory, Hilburn must establish the following elements: (1) she was subjected to an adverse employment action, (2) she was qualified for the job at that time, (3) she was known by Murata at the time to have a relative with a disability, and (4) the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a determining factor in Murata's decision. *Hartog v. Wasatch Academy,* 129 F.3d 1076, 1085 (10th Cir.1997).

Hilburn charges Murata with unlawful discriminatory conduct because of her association with her (1) son, who has a history of cancer and now suffers from a hearing loss and a learning impairment, or (2) husband, who suffers from acute pancreatitis and is diabetic. The commentary to the federal guidelines identifies those conditions which constitute physical impairments as including (1) hearing impairments, (2)

15

cancer, and (3) diabetes. 45 C.F.R. pt. 84, App. A, subpart (A)(3) (1997). The trial court rejected Hilburn's associational discrimination theory on the basis that she (1) was not qualified for the positions sought, (2) had offered an insufficient amount of evidence to establish that her son or husband was disabled under the ADA, and (3) had not proffered any genuine issue of a material fact to support a finding that she was not promoted or was laid off as a result of her association with her son or husband. *See Hilburn,* 17 F.Supp.2d at 1383-84.

We agree with the trial court that the outcome of Hilburn's associational discrimination claim is governed by the princi-ples set forth in *Tyndall v. National Educ. Ctrs., Inc.,* 31 F.3d 209 (4th Cir.1994), and *Hartog.* In *Tyndall,* the issue was whether an employer had violated the ADA by discharging an employee who was frequently absent from work due to her disability and that of a family member. *Tyndall,* 31 F.3d at 211-12. The Fourth Circuit Court of Appeals rejected Tyndall's claim because her failure to meet the attendance requirements of her job meant that she was not a "qualified individual with a disability." *Tyndall,* 31 F.3d at 212-14. Moreover, the *Tyndall* court concluded that the Company's challenged employment action was within legal bounds because it was based on an established record of the employee's absences to care for her own and, to a larger extent, her family member's disability. *Id.* at 214. The same reasoning applies here. Additionally, the *Hartog* case is instructive because it recognized the ADA distinction that "[i]f [a non-disabled employee] violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the [disabled associate]." *Hartog,* 129 F.3d at 1083 (quoting H.R.Rep. No. 101-485, pt. 2, at 61 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 303, 344).

Since Hilburn cannot establish the second associational discrimination factor of showing that she was qualified for the position sought, we need not review the holding in which the district court concluded that neither Hilburn's son nor her husband are disabled within the meaning of the ADA.

V.

16

Because we find that Hilburn has not established that she is disabled under the ADA, and because of her failure to demonstrate that she suffered associational discrimination within the meaning of the ADA, we conclude that the court below correctly granted Murata's motion for a summary judgment.

Accordingly, for the reasons that have been explained above, the judgment of the district court is AFFIRMED.