**Maxi J. GORDON, Plaintiff,**

v.

**MCG HEALTH, INC., Defendant.**

**No. CV 102–111.**

United States District Court, S.D. Georgia, Augusta Division.

Dec. 15, 2003.

Kristina M. Anderson, Anderson & Anderson, Aiken, SC, for Maxi J. Gordon, plaintiff.

James B. Ellington, Hull, Towill, Norman, Barrett & Salley, PC, Augusta, GA, for MCG Health, Inc., defendant.

## ORDER

BOWEN, Chief Judge.

The plaintiff filed the captioned case asserting claims against her employer under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. 12101 *et seq.,* the Age Discrimination in Employment Act ("the ADEA"), 29 U.S.C. § 621 *et seq.,* and under state law for intentional infliction of emotional distress. (Doc. No. 1, Ex. A.) The defendant moves for summary judgment on all claims.[1] (Doc. No. 19.) For reasons stated more fully below, the defendant's motion is **GRANTED.**

## I. BACKGROUND

The plaintiff, Maxie Gordon, was first hired by the Board of Regents of the University System of Georgia in February of 1988 to work as a staff nurse in the Adult Psychiatric Unit of the Medical College of Georgia Hospital ("MCG/BOR"). (Gordon Dep. at 13.) MCG/BOR operated the hospital until July 1, 2000, when MCG Health, Inc. ("MCGHI"), a private, nonprofit corporation, took over hospital operations. (First Hayes Aff. ¶¶ 4–6.) At that time, Gordon was given the option of either becoming an employee of MCHGI or continuing her employment with MCG/BOR, which would then lease her services to MCGHI. (Gordon Dep. at 31–32.)

Gordon chose to remain an employee of MCG/BOR and have her services leased to MCGHI. (*Id.* at 32.)

On June 6, 2000, Gordon wrote a letter to the Hospital's Chief Nursing Officer, Alicia Till, informing her that she suffered from a permanent disability that would impact greatly upon her "ability to continue nursing in a direct patient capacity" and requesting transfer to "a nursing position that did not require a lot of lifting." (Gordon Dep., Ex. 5.) Attached to this letter was an impairment rating and list of work limitations prepared by her physician which specified that Gordon should avoid lifting more than 10 pounds, repetitive bending, squatting, or stooping, and shoulder-level or overhead work. (Gordon Dep., Ex. 6.) The physician concluded that Gordon carried a "40 percent impairment of the whole person" and specified that her limitations would "impact her ability to carry out any more than sedentary activities in her profession." (*Id.*) Because the ability to lift, stoop and bend were very important to the function of a Psychiatric Staff Nurse, Gordon submitted bids for positions available in the hospital. (*Id.* at 68.) However, because there were not many alternate positions available, Gordon continued to work as Psychiatric Staff Nurse, receiving temporary assistance from her co-workers. (*Id.* at 58–59.)

On November 14, 2000, Gordon submitted a letter to MCGHI claiming that she was no longer capable of working in the same nursing capacity that she had during the previous years. (*Id.* at 60–61.) In a response letter dated November 30, 2000, Celeste Johnson, Director of Staffing in MCGHI's Human Resource Department, contacted Gordon to arrange a meeting to review Gordon's needs and to seek a possible resolution to her problems. (*Id.,* Ex.

---

1. The plaintiff voluntarily dismissed her ADEA claim subsequent to the defendant's motion for summary judgment. (Doc. No. 29.)

8.) Johnson subsequently met with Gordon in early December. (*Id.* at 71.)

Following another assessment by Gordon's physician, and his conclusion that she was incapable of climbing, stooping, or lifting more than 10 pounds (*Id.*, Def.'s Ex. 13), Gordon met with Johnson and Till on January 4, 2001 to review these restrictions. (*Id.* at 90–94.) At this meeting, Gordon asserts that they informed her that she was a liability to the hospital, could no longer work at MCG/BOR and should apply for long term disability. (*Id.*) Johnson contends, however, that Gordon was informed that she could no longer be a Senior Staff nurse because of her disability, but that Gordon was never told that she could not work for MCG/BOR. (Johnson Dep. at 27–28.)

Gordon was further advised during this meeting that her temporary arrangement for assistance would cease at the end of January because the arrangement put both herself and MCGHI at risk. (Gordon Dep. at 101–103, Ex. 19.) After that time, she could use her sick annual leave balances and would then be placed on Family Medical Leave. (*Id.*) Also, Gordon was told that during her leave time, she would be expected to cooperate with efforts to find positions for which she was qualified. (*Id.* at 104.)

Over the next several months, between November 2001 and June 2001, Gordon applied but failed to obtain several positions for which she contends that she was qualified. (*Id.* at 139–140.) MCGHI asserts that Gordon was not qualified for these positions because of its stated policy to select the best qualified individual for each position. (Second Hayes Aff. ¶ 8.) During this period Gordon was offered a part-time position as Clinical Intake Coordinator that did not exceed the work re-strictions required by her physician. (Gordon Dep. at 125–26, Ex. 23.) She declined this position, however, because it did not include the same benefits and pay as her former job. (*Id.*)

In May of 2001, Gordon accepted a vacant position as Clinical Intake Director. (Gordon Dep. at 149.) This position did not offer benefits at that time and was tentatively scheduled to end on June 30, 2001, unless permanent funding could be acquired. (*Id.;* Johnson Dep. at 45.) Gordon worked in that position through the month of June and on June 29, 2001, Gordon had two meetings with Johnson and Nannette Lewis, the Administrative Director of Psychiatry and Health Behavior, to discuss the possibility of permanent funding for that position. (Gordon Dep. at 158–59; Lewis Dep. at 32–35.) During the first meeting, which took place at around 5:00 p.m., Gordon was informed that approval for the permanent status of the position had not been obtained. (Gordon Dep. at 158–59; Lewis Dep. at 35.) Approximately thirty to forty-five minutes later, Lewis returned to Gordon's office and informed her that approval had been received for the permanent position and that she should come into work on Monday. (Gordon Dep. at 159, 161.) Gordon then requested that Lewis put this agreement in writing.[2] (*Id.* at 160; Lewis Dep. at 36.) Lewis went back to her office, wrote up the agreement and placed it in an envelope on Gordon's desk. (Lewis Dep. at 36–37.) Gordon asserts that she never received the letter before leaving work that day. (Gordon Dep. at 162.)

The next day, Saturday, June 30, 2001, Gordon left a letter for Lewis at the hospital stating that because she had not been given the agreement in writing, Gordon was turning in her key and pager under

---

**2.** Johnson participated in this second meeting via speaker phone, but was no longer on the line when Gordon made the request to get the contract in writing.

the assumption that the temporary position had ended. (*Id.,* Ex. 37.) When Lewis returned to work on Monday and found the letter, she sent Gordon a letter by FedEx reiterating the terms of employment discussed in the Friday meeting and informing Gordon that if she did not return to work by 3:00 p.m. on Thursday, July 5, 2001, Lewis would consider her to have resigned. (Lewis Dep. at 64; Pl's Ex. 7.) Gordon also denies ever receiving this letter. (Gordon Dep. at 167–68.) She did not return to work nor have any further discussions with Lewis or Johnson about the position. (*Id.* at 176.)

Gordon filed five charges with the Equal Employment Opportunity Commission ("EEOC") on July 16, 2000 against MCG/BOR, alleging race, age and disability discrimination. (*Id.* at 249, 255, 258, 261, and 264; Exs. 49, 53, 57, 60, and 64.) Four of the charges related to four different positions for which Gordon applied but was not selected. On September 28, 2001, the EEOC sent Gordon Dismissals and Right to Sue Notices related to these first four charges. (*Id.,* Exs. 52, 56, 59, and 63.) On March 29, 2002, the EEOC sent a Dismissal and a Right to Sue Notice for Gordon's fifth and final charge of discrimination, which she received shortly thereafter. (*Id.* at 268, Ex. 66.) Gordon subsequently filed this action in state court on June 24, 2002, and it was then removed to this Court on July 6, 2002.

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in [its] favor ...." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). How to carry this burden depends on who bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). If the *movant* bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, .... no reasonable jury could find for the nonmoving party." *Four Parcels,* 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Jones v. City of Columbus,* 120 F.3d 248, 254 (11th Cir.1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. *Clark,* 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* Again, how to carry this burden depends on who bears the burden of proof at trial. If the *movant* has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. If the *non-movant* bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Fitzpatrick,* 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross,* 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The clerk has given the non-moving party notice (Doc. No. 27) of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822, 825 (11th Cir.1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is ready for consideration.

## III.  ANALYSIS

### A.  Sufficient Notice

■ In all five of her EEOC charges, the plaintiff, without the benefit of counsel, named MCG/BOR, but not MCGHI. (Pl. Resp. to Mot. for Summ. J. Exs. Z, BB, DD, FF, HH.) The defendant contends that the failure to name MCGHI in the EEOC proceedings precludes a later suit against it on the grounds stated in the EEOC complaint. The ADA adopts the procedural requirements of Title VII. 42 U.S.C. § 12117(a). Only parties previously identified as respondents in charges filed with the EEOC are subject to subsequent liability under Title VII. *Virgo v. Riviera Beach Assoc. Ltd.,* 30 F.3d 1350, 1358–59 (11th Cir.1994) (citations omitted). In general, a defendant not named in the plaintiff's EEOC charge is not properly before the court unless the notification purposes of the EEOC filing requirement are otherwise satisfied; however, courts liberally construe this naming requirement. *Id.* In order to determine whether a party unnamed in the EEOC charge may be subjected to the jurisdiction of federal court, courts consider several factors including: (1) the similarity of interest between the named and unnamed party; (2) whether the unnamed party's identity could have been ascertained by the plaintiff at the time of the EEOC filing; (3) whether the unnamed party received adequate notice of the charges; (4) whether the unnamed party had adequate opportunity to participate in reconciliation proceedings; and (5) whether exclusion from the EEOC proceedings actually work a prejudice on the unnamed party. *Id.* at 1359.

In this case, the defendant was sufficiently put on notice that it was subject to

suit. First, MCGHI is closely related to MCG/BOR because the defendant, a nonprofit organization, operates the hospital and clinics owned by MCG/BOR. (First Hayes Aff. at ¶ 4.) Where an unnamed defendant is a closely related entity to the named party, it should be held to have received notice. *Virgo,* 30 F.3d at 1358–59. Second, as part of its response to the EEOC charges, MCG/BOR requested and received numerous documents from MCGHI. (Second Hayes Aff. at ¶ 4.) Thus, it cannot be argued that the defendant did not have adequate notice of the charges and an opportunity to participate in reconciliation proceedings. Third, although it was possible for the plaintiff to ascertain the identity of MCGHI at the time she filed the EEOC charges, proceeding pro se, she believed that she was filing against the correct party. Finally, there is no evidence that the defendant has been prejudiced by its exclusion from the EEOC proceedings. Therefore, the Court will consider the defendant to have had notice of the plaintiff's charges and will now analyze the plaintiff's claims against it.

**B. Timeliness of Plaintiff's Claims**

■ Under the ADA, a plaintiff has ninety days to file a civil action following the receipt of her Right to Sue Notice. 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e–5(f)(1). In this case, the plaintiff filed five separate charges of discrimination with the EEOC. The first four of these charges specifically alleged that the plaintiff was not selected for positions for which she claims she was qualified. (Gordon Dep. at 249, 255, 258–59, 261–62, 264–65.) The plaintiff received the Right to Sue Notices on these charges shortly after September 28, 2001, and she filed this action on June 24, 2002, well after the ninety-day period. The fifth EEOC charge focused on the plaintiff's dismissal from her employment with MCG/BOR. (*Id.* at 265.) The Right to Sue Notice on this charge, however, was received on March 29, 2002. The plaintiff claims that the last charge, which was filed within the requisite period, provides a "catch-all" that allows the other claims to be entered as a demonstration of the defendant's continual discrimination.

The law is clearly established that discrete, time-barred discriminatory actions are not actionable, regardless of how they may relate to actions that were filed in a timely fashion. *See, e.g., National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Discrete acts are recognized as actions "such as termination, failure to promote, denial of transfer, or refusal to hire …." *Id.* at 114, 122 S.Ct. 2061; *see also EEOC v. Joe's Stone Crabs, Inc.,* 296 F.3d 1265, 1271–72 (11th Cir.2002) (holding that failure to hire was discrete event and not continuing violation which would extend filing limitations period). Each of the alleged adverse employment decisions herein constitutes a separate actionable event, not a continuing action of discrimination.

Furthermore, "the permissible scope of a civil action is limited to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 455 (5th Cir. 1970).[3] Similar to this Court's holding that a claim of discriminatory discharge is beyond the permissible scope of the complaint where allegations in the EEOC charge pertained only to discrimination in hiring and promotion, the plaintiff's EEOC

---

**3.** In *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.

charges of non-selection for certain positions are beyond the scope of judicial review where the only timely claim alleges discriminatory dismissal. *Johnson v. Richmond County*, 507 F.Supp. 993, 995–96 (S.D.Ga.1981). Therefore, the plaintiff may not use her last EEOC charge as a means of bringing before the Court the four, time-barred charges, and her suit may only continue on her fifth and final EEOC charge related to her dismissal.

## C. Plaintiff's ADA Claim

The ADA prohibits an employer from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, the plaintiff must show that: (1) she is disabled; (2) she was a qualified individual; and (3) she was discriminated against because of her disability. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir.2001). As discussed below, there is no genuine issue of material fact whether the plaintiff's impairments rise to the level of a disability under the ADA.

Under the ADA, an individual has a disability if she: 1) has a physical or mental impairment that substantially limits one or more of her major life activities; 2) has a record of such an impairment; or 3) is regarded as having such an impairment. 42 U.S.C. § 12102(2). Major life activities are enumerated by an EEOC regulation as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (2001). According to the EEOC regulations, "substantially limited" means "[s]ignificantly restricted as to the condition, manner or

duration under which [the] individual can perform [the] particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." *Id.* § 1630.2(j)(1)(ii). In assessing whether a person is substantially limited in a major life activity, the court is to consider "the nature and severity of the impairment, the duration or expected duration of the impairment, and the expected permanent or long term impact of or resulting from the impairment." *Id.* § 1630.2(j)(2). Accordingly, the plaintiff must do more than show some minor limitation in a major life activity—the term "substantially limits" must be interpreted strictly to create a "demanding standard" for qualifying as disabled under the ADA. *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). The plaintiff alleges that she has an impairment that substantially limits one or more major life activities and that she was regarded by the defendant as having such an impairment.

*a. Whether the plaintiff's impairments substantially limit her major life activities.*

■ It is undisputed that the plaintiff's numerous impairments restrict her from lifting more than ten pounds, or engaging in repetitive bending, squatting, and stooping, and shoulder-level or overhead work. However, the plaintiff's physical impairments do not substantially limit any major life activity. "When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Id.* at 200–01, 122 S.Ct. 681. The plaintiff has demonstrated by her own testimony that she lives alone and is able

to cook and clean, as well as drive long distances and otherwise take care of herself. (Gordon Dep. at 85–87, 209–10, 275–76.) Therefore, her impairments clearly do not prevent her from performing activities central to people's daily lives and do not substantially limit a major life activity. *See Cash v. Smith,* 231 F.3d 1301, 1306 (11th Cir.2000); *Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d 1220, 1228 (11th Cir.1999).

*b. Whether there exists a record of impairment.*

Although the ADA does not define "record of such impairment," the regulations provide that this means: "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). The defendant had several documents which record the plaintiff's medical condition and limitations including letters written by the plaintiff and her physician, medical case summaries, physical impairment ratings, and memoranda circulated between various offices of the defendant. (Gordon Dep., Exs. 5–10, 12, 18–19.) Further, there is record that the plaintiff was encouraged to apply for long term disability (*id.* at 91); placed on sick leave, annual leave, and family medical leave after she was no longer able to work as a staff nurse (*id.* at 103; Ex. 19); and is currently receiving long term disability payments (*id.* at 33). Although this evidence tends to prove that the plaintiff has a record of *impairment,* it fails to establish a record of a *disability* under the ADA. The record standard is satisfied only if the plaintiff actually suffered a physical impairment that substantially limited one or more of her major life activities. *Hilburn,* 181 F.3d at 1229. Since the plaintiff does not have an impairment that limits a major life activity, there is also no "record of such impairment."

*c. Whether the plaintiff was regarded as substantially limited in a major life activity.*

█ In an effort to avoid summary judgment, the plaintiff asserts that, even if she does not have a disability that substantially limits a major life activity, the defendant regarded her as disabled. Under the ADA, an individual will be considered disabled if she is regarded by her employer as having an impairment that substantially limits a major life activity. 42 U.S.C. § 12102(2)(C). An individual is regarded as having a substantially limiting impairment if she "(1) has an impairment that does not substantially limit a major life activity, but is treated by an employer as though it does; (2) has an impairment that limits a major life activity only because of others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a disability as recognized by the ADA." *Hilburn,* 181 F.3d at 1230 (citing 29 C.F.R. § 1630.2(1)).

The plaintiff points to several acts or statements by the defendant's employees that allegedly demonstrate that she was regarded as disabled. First, the plaintiff asserts that the defendant regarded her as disabled because it determined that she was unable to perform the essential functions of a staff nurse position. Regarding an employee as being precluded from a particular position because of an impairment does not mean that an employer has determined the individual to be disabled under the ADA. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 493, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). If jobs utilizing a plaintiff's skills are available, that individual is not considered substantially limited in her ability to work. *Cash,* 231 F.3d at 1306–07. Because the position of staff nurse was a single job, the plaintiff's allegation does not support the claim that

the defendant regarded her as having a *substantially limiting* impairment. *See* 29 C.F.R. § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.") There were a number of other positions utilizing the plaintiff's skills that were available to her; and the defendant encouraged the plaintiff to find other jobs within MCG/BOR. (Gordon Dep. at 68, 91–92, 104.) *See Mason v. United Air Lines, Inc.*, 274 F.3d 314, 317 (5th Cir.2001). In fact, the defendant offered the plaintiff the opportunity to work in two separate clinical intake positions. (Gordon Dep. at 125–26, 133–35.) In May 2001, the plaintiff was offered and accepted a full-time position of Clinical Intake Coordinator and worked in this position until her resignation at the end of June 2001. (*Id.* at 143.) The plaintiff's continued employment undermines her position that she was regarded by the defendant as substantially limited in a major life activity. *See Cash*, 231 F.3d at 1306–17. The defendant has demonstrated that it only considered the plaintiff's impairment as disqualifying her from the position of staff nurse, but not "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." 29 C.F.R. § 1630.2(j)(3)(i).

■ As further support for her claim that the defendant regarded her as being impaired, the plaintiff relies on several comments made by Celeste Johnson. According to the plaintiff, Johnson called her "disabled," and told her that she was "a liability" and should look into getting long term disability insurance. (Gordon Dep. at 75, 91–93.) Johnson also allegedly told the plaintiff that she could not work at the hospital because of her disabilities. (*Id.*) The defendant counters that Johnson did not make such statements, and even if she did, the remarks reflect nothing more than an awareness of the plaintiff's physical limitations and the potential risk these limitations presented to the plaintiff and patients.

Under the ADA standards, Johnson's comments do not create a material fact issue on whether the defendant regarded the plaintiff as having a substantially limiting impairment. First, referring to the plaintiff as "disabled" and suggesting she look into getting disability insurance is not synonymous with regarding the plaintiff as substantially limited in one or more major life activities. Undoubtedly, the laymen's denotation of "disabled" and the ADA definition of that term for purposes of disability discrimination are very different. Further, courts have held that a plaintiff's receipt of disability leave or disability insurance was insufficient to show that an impairment substantially limited a major life activity, or that the plaintiff had a record of a disability. *See, e.g., Sherrod*, 132 F.3d at 1121; *Doebele v. Sprint/United Management Co.*, 342 F.3d 1117, 1132 (10th Cir.2003). Therefore, it is reasonable to conclude that a supervisor's suggestion that an employee seek disability insurance also fails to show that the employer regarded a plaintiff as disabled.

Second, Johnson's perception that the plaintiff could not perform the tasks of staff nurse safely does not establish that the defendant regarded the plaintiff as disabled under the ADA definition. *See Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir.1999). As the defendant maintains, Johnson's use of the word "liability" is open to various reasonable interpretations. Johnson appears to have been expressing to the plaintiff, albeit rather insensitively, her opinion that having the plaintiff work in a position with direct patient care put the plaintiff, patients, and the defendant at risk. The plaintiff seems to concede as much. When asked whether she had any concerns about her inability to perform the essential functions of staff nurse and the

possibility that her limitations could be a liability to herself, the patients, or the hospital, the plaintiff responded, "My main concern was that I could give adequate patient care .... I do not want to injure myself, but my main concern was, that if I tried to pick up a patient and ... dropped a patient, this is going to injure the patient." (Gordon Dep. at 95–96.)

Finally, the Court must consider these comments in the light most favorable to the plaintiff, but it cannot do so in isolation. *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 193 (5th Cir.1996). Although Johnson allegedly told the plaintiff that she could not work at MCG because of her disabilities, there is no evidence that the defendant tried to prevent the plaintiff from working. As discussed *supra,* the plaintiff was removed from the position of staff nurse, but she was offered, and accepted, another position. The misunderstanding that led to the plaintiff's voluntary resignation is unfortunate, but the fact that the defendant offered her another position, which she did not accept, precludes there being a material fact issue as to whether the defendant regarded the plaintiff as having a substantially limiting impairment. While Johnson's remarks are lamentable, they do not provide evidence that the defendant regarded the plaintiff as being substantially limited in a major life activity. Not only were jobs utilizing the plaintiff's skills available, but the defendant was in fact employing her in such a position.

When reviewed in the light most favorable to the plaintiff, the evidence in the record demonstrates that the defendant regarded the plaintiff as physically impaired, but it is insufficient to support a finding that the defendant regarded the plaintiff as disabled. The plaintiff has

therefore failed to establish a prima facie case of discrimination under the ADA.

## IV. CONCLUSION

For the aforementioned reasons, the defendant's motion for summary judgment is **GRANTED.** (Doc. No. 19.) The clerk is directed to **CLOSE** the case and **ENTER FINAL JUDGMENT** in favor of the defendant. Costs are taxed against the plaintiff. All other claims against the defendant are **DISMISSED WITHOUT PREJUDICE.**[4] 28 U.S.C. § 1367(c) (3).

---

4. Since summary judgment has been granted for the plaintiff's ADA claims, I decline to exercise jurisdiction over the state law claim of intentional infliction of emotional distress.