**Larry MILLER, Plaintiff,**

v.

**GENERAL WHOLESALE
CO., INC., Defendant.**

**No. CIV.A.1:98CV2156–JOF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 16, 2000.

Milton Dale Rowan, William Nathan Hershman, Chip Rowan & Associates Atlanta, GA, for plaintiff.

Charles A. Hawkins, Allison E. Thornton, Fisher & Phillips, Atlanta, GA, for defendant.

### ORDER

FORRESTER, District Judge.

This matter is before the court on Defendant's motion for summary judgment.

## I. STATEMENT OF THE CASE

### A. *Procedural History*

Plaintiff, Larry Miller, brings this action against his former employer, General Wholesale Company, Inc. ("General Wholesale"). Plaintiff alleges that he was discharged from General Wholesale because of a disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and O.C.G.A. § 51–1–6. Plaintiff seeks compensatory and punitive damages, declaratory relief, and costs and attorney's fees. Defendant filed a motion for summary judgment as to all claims on June 4, 1999.

### B. *Facts*

General Wholesale is a wholesale distributor of wine, beer, and other spirits. General Wholesale hired Plaintiff in 1991 as a beer and wine salesperson for approximately fifty stores in the Cobb County area. Plaintiff normally spent four days per week, Monday through Thursday, servicing the stores in his area, and he spent Fridays at General Wholesale's offices for sales meetings.

During his time with General Wholesale, Plaintiff suffered from a condition known as Berger's disease, an illness that affects the kidneys and can lead to severe damage, including kidney failure. Although Plaintiff was first diagnosed with Berger's disease in 1982, the disease did not cause him any serious problems until 1994, at which time laboratory tests revealed that Plaintiff was in kidney failure. Plaintiff was subsequently hospitalized and had catheters inserted for purposes of dialysis. Plaintiff informed his supervisor, Hal Shaw, about his kidney problems and mentioned that he would have to be hospitalized. (Miller Depo., p. 172). After the insertion of the catheters, however, Plaintiff's condition stabilized, and his doctors determined that Plaintiff would not have to undergo dialysis after all.

Plaintiff continued working for General Wholesale, but issues were subsequently raised concerning his job performance. In 1995, five customers in Plaintiff's area lodged complaints against him and requested that General Wholesale be removed from their accounts. Additionally, in September 1995, Shaw placed Miller on probation for falsifying records with regard to a promotional contest concerning the sales of a particular type of liquor. The contest was based upon sales of the product to customers who had not ordered the product previously or had not done so within the last ninety days. Shaw discovered that Plaintiff had attempted to obtain credit for accounts where the customer had previously ordered the product within the last ninety days. (Shaw Depo., p. 61). While Plaintiff testified that the error was due to a mistake in paperwork, he admitted that he reported that certain accounts met the criteria for the contest when they actually did not. (Miller Depo., pp. 107–09).

Sometime in 1996, Plaintiff's kidney condition again worsened, and he was forced to begin peritoneal dialysis. This type of dialysis enables the patient to perform the dialysis himself without visits to the hospital for treatment. Plaintiff performed this dialysis four times daily, each treatment lasting approximately twenty-five minutes. Plaintiff performed the dialysis before work, during his lunch hour, when he arrived home from work, and before he went

to bed. Plaintiff's work schedule often permitted him to perform his lunchtime dialysis at home. Plaintiff continued performing peritoneal dialysis for the remainder of his employment with General Wholesale.

Jimmy Jones became Plaintiff's new supervisor at General Wholesale in November 1996, after Plaintiff began his peritoneal dialysis. Jones soon found out about Plaintiff's kidney problem, and he and Plaintiff at times discussed the dialysis treatments because Jones's father-in-law also received dialysis. (Jones Depo., pp. 37–38). Shaw similarly testified that, although Plaintiff was not working for him at that time, Plaintiff informed him that Plaintiff was again suffering kidney problems and had to undergo dialysis. (Shaw Depo., pp. 29–30; *see also* Miller Depo., p. 271). Neither Jones nor Shaw, according to their testimony, felt that the dialysis treatment affected Plaintiff's ability to perform his job. (Jones Depo., p. 38; Shaw Depo., p. 30).

The evidence regarding Plaintiff's performance at General Wholesale is mixed. During his employment with the company, Plaintiff received sales awards, including "salesman of the month." (Miller Depo., p. 264). Plaintiff was named the third top salesman, out of a total of fifteen or sixteen salespeople, in 1996. Plaintiff also testified that he placed in most of the top sales awards for different months in 1997. (*Id.* at 126). Jones testified that, when he took over as Plaintiff's supervisor, he was informed by Shaw and Kip Little, who was General Sales Manager, that Plaintiff had made excellent progress in the distribution of certain products. Jones also testified, however, that Shaw and Little discussed with him that Plaintiff had been removed from several accounts and that Plaintiff lacked aggressiveness in utilizing "point of sale" merchandising and promotional items. (Jones Depo., pp. 9–10). Little testified that Plaintiff's sales improved during 1997, but he also indicated that everyone's sales similarly improved during that time. (Little Depo., pp. 49–50). Also, Jones testified that, after he took over as

Plaintiff's supervisor, he verbally discussed with Plaintiff areas in which Plaintiff needed to improve. (Jones Depo., p. 46).

In May 1997, Plaintiff received a performance evaluation from Jones containing a mixed review. On the one hand, the evaluation noted that Plaintiff's spirit sales had increased by 3.81%, his beer sales had increased by 9.01%, and his wine sales had increased by 92.83%. Additionally, Jones commented that Plaintiff had "shown a great increase in his selling and distribution in the pass [sic] 4 months." (Jones Depo., Ex. 1). On the other hand, Jones rated Plaintiff as failing to meet standards in, among others, the following areas: awareness of competitive sales trends; account development; sales presentations; non-alcohol sales increases; working the entire order pad of General Wholesale products; cold box merchandising; survey/inventory; and "steps to sales call," which concerns preparation before initiating a sales call. According to Jones' testimony, being aware of competitive sales trends is especially important in the alcohol distribution industry. (*Id.* at 21). Jones gave Plaintiff an overall rating of 1.9, just below the "meets standards" rating of 2.0. Jones testified, however, that he gave no other sales representative a rating higher than 1.9. (*Id.* at 18, 34).

The next month, in June 1997, Little and Jones decided to begin looking for a replacement for Plaintiff. According to Jones' testimony, this decision was prompted by recurring problems that "constantly" had to be brought to Plaintiff's attention. (Jones Depo., p. 32). Little additionally informed Shaw to be on the lookout for someone to take Plaintiff's place as a sales representative. Shaw testified that he understood Little's comments to indicate that a decision had been made to terminate Plaintiff. (Shaw Depo., p. 17). On the other hand, Jones testified that he and Little had decided that another salesman would be needed if General Wholesale could not "bring [Plaintiff] around, up to meet company standards"

and that the company "was only putting feelers out for a new salesman at that time." (Jones Depo., pp. 28–29, 35). Jones further testified that Plaintiff was not informed of the decision because Jones hoped that Plaintiff would improve within the next month or two, and Jones had "no problem keeping [Plaintiff] aboard" if an improvement occurred. (*Id.* at 35). Jones testified, however, that he was primarily waiting for a suitable replacement and intended to replace Plaintiff as soon as a suitable candidate was found. (*Id.* at 36).

Problems continued during the summer of 1997, particularly concerning Plaintiff's participation in two of General Wholesale's promotional contests. One of the contests was based on sales of a product called Tequila Rose, but Plaintiff turned in incentives on another product called Tanqueray. Jones testified that Plaintiff excused the incident by indicating that he had mistakenly written down the wrong program number. Jones nevertheless disciplined Plaintiff because he felt that Plaintiff was not paying attention in sales meetings. In fact, Jones testified that he had noticed Plaintiff "dozing off" during some of the meetings and had admonished Plaintiff for this behavior. (Jones Depo., pp. 29–30, 41–42). The second contest concerned a promotion where the sales representative could either offer additional savings to the customer or turn in a form to earn a bonus on the sale. Plaintiff apparently attempted to do both. (Shaw Depo., p. 108; Jones Depo., p. 40). On July 11, 1997, Jones placed Plaintiff on thirty-days' probation, in which Plaintiff was to work on gaining "substantial improvement in the aspect of administrative and required documents pertaining to sales and incentive form." (Def.Ex. 8).

Problems also arose concerning customers in Plaintiff's sales territory. According to an affidavit provided by Jones, a customer contacted him about Plaintiff on June 2, 1997. Jones visited the customer the next day, and the customer requested that a new sales representative be assigned to his store. Jones talked to the customer, and the customer agreed to allow Plaintiff to remain on the account. Jones subsequently fashioned a plan for Plaintiff to follow in order to improve relations with the customer. On July 7, 1997, however, when Jones checked on Plaintiff's progress, the customer informed Jones that Plaintiff had not improved. Jones therefore assigned another sales representative to the customer's account, and he informed Plaintiff that further action would have to be taken if another customer requested that Plaintiff be removed from an account. (Def.Ex. 9, ¶ 4).

Due to a restructuring of territories, Hal Shaw again became Plaintiff's supervisor in September 1997. Jones testified that he gave Plaintiff's personnel and evaluation folders to Shaw and that the two men discussed the disciplinary action taken against Plaintiff. (Jones Depo., p. 44). At some point during that same month, according to Shaw's testimony, Shaw removed Plaintiff from yet another account. Shaw testified that one of the customers requested that Plaintiff be removed from an account because of inaccurate orders and other problems. Shaw further testified that he informed Plaintiff of the complaint and removed him from the account. (*Id.* at 74–76). Plaintiff, however, denied that Shaw talked to him about performance issues in September 1997. (Miller Depo., p. 203).

Sometime around September 19, 1997, Plaintiff attended a meeting in Shaw's office where a discussion ensued regarding Plaintiff's health. The exact nature of this discussion is heavily disputed. According to Plaintiff's testimony, Shaw sarcastically asked about Plaintiff's health, and Plaintiff stated that he was still undergoing dialysis. Plaintiff testified that Shaw questioned Plaintiff further about performing the dialysis, the cost of the treatment, and Plaintiff's ability to work while undergoing the treatment. Plaintiff further testified that Shaw said that he might have to take away some of Plaintiff's accounts so that Plaintiff could more properly perform the dialysis, indicating that Plaintiff perhaps

needed more time to perform the treatment. Plaintiff replied that he would rather Shaw not take away any accounts as Plaintiff could barely pay his bills already. At that point, according to Plaintiff's testimony, the conversation simply ended. (Miller Depo., pp. 194–95). Shaw testified, however, that the incident to which Plaintiff refers took place during a team meeting with several employees present. Shaw further testified that the employees were engaged in conversation while Shaw took care of some paperwork, not really listening to the conversation. According to Shaw, someone else in the office asked Plaintiff about his health. Shaw agreed that, during the course of the conversation, Plaintiff's dialysis and the cost of performing the treatment were discussed, but Shaw specifically denied that he asked Plaintiff about either his health or the cost of the dialysis. Shaw additionally testified that Plaintiff told the group that he did not have sufficient time off from work to perform the dialysis properly. (Shaw Depo., pp. 42–46).

Finally, Shaw testified that another of Plaintiff's customers requested a different salesperson on September 30, 1997. (Shaw Depo., pp. 73–74). Plaintiff was discharged from General Wholesale that same day.

## II. DISCUSSION

### A. *Plaintiff's ADA Claim*

Defendant moves for summary judgment as to Plaintiff's ADA claim, contending that Plaintiff has not produced evidence sufficient to establish either a *prima facie* case of discrimination or to show that the reasons proffered for his termination are pretextual. Plaintiff, however, contends that he has produced direct evidence of discrimination and the burden-shifting framework whereby he must demonstrate a *prima facie* case, and subsequently pretext, does not apply. Alternatively, Plaintiff maintains that he has nevertheless produced sufficient evidence to demonstrate both a *prima facie* case of discrimination and pretext, thereby rendering summary

judgment inappropriate. For the following reasons, the court disagrees and finds that summary judgment is proper in this case.

### 1. *Direct Evidence of Discrimination*

The ADA mandates that employers shall not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The burden-shifting analysis applicable to Title VII employment discrimination claims is equally applicable to claims of discrimination under the ADA. *Hilburn v. Murata Elec. N. America, Inc.,* 181 F.3d 1220, 1226 (11th Cir.1999). Under this framework, Plaintiff first has the burden of proving a *prima facie* case of disability discrimination by a preponderance of the evidence. *Id.*

Plaintiff, however, claims that the conversation about his health that occurred on September 19, 1997, where Shaw indicated that he might need to take away some of Plaintiff's accounts, constitutes direct evidence of discrimination. Therefore, Plaintiff contends that the burden-shifting analysis does not apply and General Wholesale may prevail only by proving that it would have made the same decision even if it had not allowed discrimination to play a role. *See Haynes v. W.C. Caye & Co.,* 52 F.3d 928, 931 (11th Cir.1995). Direct evidence is evidence which, if believed, proves the existence of a fact in issue without inference or presumption. *See, e.g., Burrell v. Board of Trustees of Ga. Military College,* 125 F.3d 1390, 1393 (11th Cir.1997); *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir.1997). Evidence that merely suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence. *Merritt,* 120 F.3d at 1189.

Under this standard, the court cannot say that the conversation about Plaintiff's health constitutes direct evidence of discrimination. Plaintiff claims that he was discharged from General Wholesale because of his kidney problems. The fact in issue, as Defendant points out, concerns whether Plaintiff was fired because he is disabled. Shaw's inquiries about Plaintiff's health and comments about reducing Plaintiff's accounts so as to provide Plaintiff more time to conduct his dialysis at best only *suggest* a discriminatory motive. To find discriminatory animus from Shaw's comments, the fact finder would have to infer that those comments somehow demonstrated a desire to terminate Plaintiff because of his health problems. As Defendant points out, however, the fact finder could equally infer from Shaw's comments a genuine concern for Plaintiff's well-being. Accordingly, this evidence does not *prove* the existence of a discriminatory motive and does not constitute direct evidence of discrimination. By definition, then, this evidence is circumstantial evidence. *See Burrell,* 125 F.3d at 1393–94. As such, the burden-shifting analysis applies and Plaintiff must first establish a *prima facie* case.

### 2. *Prima Facie Case*

To establish a *prima facie* case of disability discrimination under the ADA, Plaintiff must demonstrate that he (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination – in this case, termination – because of his disability. *Hilburn,* 181 F.3d at 1226. For purposes of summary judgment, Defendant does not dispute either that Plaintiff has a disability or that he is a qualified individual for the position of sales representative. The issue therefore concerns whether Plaintiff was subjected to unlawful discrimination because of his disability.

The ADA encompasses two distinct types of discrimination. First, the statute prohibits treating a qualified individual with a disability differently because of that disability. Second, the ADA prohibits an employer from not making a reasonable accommodation to the known disability of an otherwise qualified individual. *See Sieberns v. Wal–Mart Stores, Inc.,* 125 F.3d 1019, 1021–22 (7th Cir.1997). In this case, Plaintiff proceeds under the first type of discrimination, known as "disparate treatment," alleging that he was terminated from General Wholesale because he had Berger's disease. The gravamen of a disparate treatment claim is that the employer intentionally discriminated against a member of a protected class – here, an individual with a disability – as compared with the treatment of a member of a non-protected class – here, an individual not suffering from a disability. *McCollough v. Atlanta Beverage Co.,* 929 F.Supp. 1489, 1506–07 n. 15 (N.D.Ga.1996) (Carnes, J.). Thus, to succeed on such a claim, Plaintiff must show that General Wholesale *intended* to discriminate against him on the basis of his disability. *See Berg v. Florida Dept. of Labor & Employment Security Div.,* 163 F.3d 1251, 1255 (11th Cir.1998) (rejecting claim under Rehabilitation Act because plaintiff failed to establish intentional discrimination).[1]

Plaintiff offers the following evidence to show discriminatory intent and thereby satisfy the third element of his *prima facie* case. First, Plaintiff again points to Shaw's comments about reducing Plaintiff's accounts so that Plaintiff would have more time to perform his dialysis, contending that these statements constitute strong circumstantial evidence of discrimination. Second, Plaintiff notes the temporal proximity between those comments and his termination, a fact which, according to Plaintiff, suggests that he was discharged because of his disability. Plaintiff also notes that he had been named as one of General Wholesale's top three sales representatives in 1996 and had increased his sales performance in 1997. Additionally, Plaintiff points out

---

1. The standard for determining liability under the Rehabilitation Act is the same as that under the ADA. *Sutton v. Lader,* 185 F.3d 1203, 1207–08 n. 5 (11th Cir.1999).

that, when Jones took over as Plaintiff's supervisor, Shaw informed him that Plaintiff had made excellent progress in distribution. Finally, Plaintiff notes that, while his May 1997 evaluation was slightly below standards, Jones did not rate any of the other sales representatives under his supervision higher than the 1.9 given to Plaintiff.[2] The court finds that this evidence is insufficient to establish discriminatory intent. The conversation between Plaintiff and Shaw does not give rise to an inference that Shaw sought to terminate Plaintiff because of his disability. Indeed, under Plaintiff's version of the conversation, Shaw at no time mentioned terminating Plaintiff. Rather, the conversation gives rise to an inference that Shaw was considering a reasonable accommodation, seeking to allow Plaintiff more time in which to perform his treatment. Because the law requires employers to reasonably accommodate disabled employees, the court is loathe to hold General Wholesale liable for considering such an accommodation. Additionally, Plaintiff's accolades and job performance do not give rise to an inference of intentional discrimination. While Plaintiff had earned sales awards and increased his sales performance, he had also in the past submitted false reports, been disciplined, and been removed from several customer accounts. Plaintiff has not disputed Jones' testimony that he admonished Plaintiff for sleeping during sales meetings and constantly had to discuss with Plaintiff areas in which Plaintiff needed to improve. Moreover, the fact that none of Jones' other employees received an evaluation score higher than Plaintiff does establish discrimination when there is no evidence that any of those employees had the same blemishes on their overall performance record. Plaintiff simply has not provided any evidence that a similarly-situated non disabled employee, with the same job performance record as Plaintiff, was treated differently by General Wholesale. Accordingly, Plaintiff has not demonstrated that his termination was "because of his disability," and he has not made out a *prima facie* case under the ADA. *See Berg,* 163 F.3d at 1255 (finding that plaintiff's claim failed in part because he did not establish that he had been treated differently from anyone else); *Terrell v. USAir,* 132 F.3d 621, 627 (11th Cir.1998) (citing with approval language from *Daugherty v. El Paso,* 56 F.3d 695, 700 (5th Cir.1995), which held that plaintiff's ADA claim failed because he could not show that he had been treated differently from other employees). Because Plaintiff has failed to establish his *prima facie* case, the court need not consider the remaining steps of the burden-shifting analysis, and Defendant's motion for summary judgment is GRANTED as to Plaintiff's ADA claim.

### B. *Plaintiff's State Law Claim*

Defendant moves for summary judgment on Plaintiff's state law claim as well, arguing that O.C.G.A. § 51–1–6 does not provide an additional right of action where an express cause of action already exists under the ADA. Plaintiff, however, argues that O.C.G.A. § 51–1–6 provides a cause of action for violations of any duties created by the ADA. Accordingly, Plaintiff urges the court to deny Defendant's motion for summary judgment.

■ Section 51–1–6 provides a cause of action for the breach of a legal duty

---

**2.** Plaintiff also alleges that he was never told either that his performance was substandard or that he faced potential dismissal. This argument is belied by the record, however, as Plaintiff has offered no evidence to dispute Jones' testimony that he constantly had to speak with Plaintiff about recurring problems, that he admonished Plaintiff for sleeping during a sales meeting, and that he informed Plaintiff of the customer complaint that led to Plaintiff's removal from an ac-

count on July 7, 1997. (Jones Depo., pp. 29–30, 32; Def. Ex. 9, ¶ 4). It is similarly undisputed that Plaintiff was twice placed on probation for submitting false reports. Additionally, Plaintiff argues that the reasons given for his termination are implausible, inconsistent, incoherent, and contradictory. This argument addresses the credibility of the proffered reasons for Plaintiff's termination and therefore is more properly discussed in the "pretext" stage of the burden-shifting analysis.

"[w]hen the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms...." O.C.G.A. § 51-1-6. It seems clear from the language of the statute that no cause of action is created where, as here, an express cause of action already exists. *See Phillips v. DAP, Inc.,* 10 F.Supp.2d 1334, 1336 (N.D.Ga.1998) (Murphy, J.), *aff'd,* 165 F.3d 41 (11th Cir.1998) (table disposition). *See also Jairath v. Dyer,* 972 F.Supp. 1461 (N.D.Ga.1997), *vacated on other grounds,* 154 F.3d 1280 (11th Cir.1998) (finding that plaintiff could not recover under § 51-1-6 for violation of ADA); *Reilly v. Alcan Aluminum Corp.,* 181 F.3d 1206, 1208 (11th Cir.1999) (discussing *Jairath* and certifying question to Georgia Supreme Court whether § 51-1-6 provides cause of action for violation of Age Discrimination in Employment Act). In any event, because the court has found that Defendant did not violate Plaintiff's rights under the ADA, Plaintiff cannot maintain his action under § 51-1-6. *See Phillips,* 10 F.Supp.2d at 1336. Accordingly, the court GRANTS Defendant's motion for summary judgment as to Plaintiff's state law claim as well.

## III.  CONCLUSION

The court GRANTS Defendant's motion for summary judgment [14-1] as to all claims.