PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 06 2000
THOMAS K. KAHN
CLERK

_____

No 99-11454

_____

D.C. Docket No. 97-02524-CV-JAL

MAURICE PARRIS,

Plaintiff-Appellant,

versus

THE MIAMI HERALD PUBLISHING COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 6, 2000)**

Before TJOFLAT and BRIGHT[*], Circuit Judges, and NESBITT[**], District Judge.

BRIGHT, Circuit Judge.

_____

[*]Honorable Myron H. Bright, United States Circuit Judge for the Eighth Circuit, sitting by designation.

[**]Honorable Lenore C. Nesbitt, District Judge for the Southern District of Florida, sitting by designation.

Maurice Parris appeals the district court's grant of summary judgment to his former employer, The Miami Herald Publishing Company ("Miami Herald" or "Herald") on both Parris's federal claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, and on his state law claim for breach of the sick pay policy pursuant to his employment contract. The Herald terminated Parris from employment on July 31, 1996. The district court ruled in favor of the Miami Herald on grounds that the Herald had slated Parris's at-will job for termination prior to his absence, as part of the company's internal restructuring, and that the FMLA does not "toll" a fully-documented and scheduled job termination. We reverse based on numerous factual disputes relating to whether Parris would have continued working beyond July 31, 1996, if he had not sustained serious injuries.

## I. BACKGROUND

Appellant, Maurice Parris, worked as a Distribution Manager, supervising door-to-door delivery personnel, in the Miami Herald's "Alternate Delivery Department" ("ADD") at the time his cause of action arose. The Herald had promoted Parris to this supervisory position on the basis of his exemplary work effort in more junior positions with the Herald.

In April 1996, the Miami Herald initiated a plan to reduce costs by restructuring its departments and radically shrinking the size of the ADD in which Parris worked.

The Miami Herald eliminated twelve of the eighteen positions for distribution managers, and a total of sixteen positions from the original thirty-one in the ADD. The record shows that, as part of its restructuring effort, the Herald attempted to shift the displaced ADD employees to other departments rather than terminate them. The Herald made efforts to facilitate continuous employment and informed staff that severance packages would be available only as a last resort for those who did not accept new jobs at the company.

The Herald quickly set about determining which employees would remain in the ADD after it completed the restructuring. The Herald selected, by April 15, the ADD employees who would retain their positions after restructuring, and Parris was not among them. By April 16, it became clear that Parris's position would be terminated and that he would need a different position in the company in order to stay. Parris then began seeking other job opportunities within the Miami Herald. Parris's initial attempts to find other positions at the Herald failed. He interviewed for three positions during April and May, but he was not selected for those positions. Nothing in the record indicates that the Herald informed Parris of any particular date upon which he would lose his job if he did not find an alternative position.

Restructuring of the ADD actually began in May 1996 when the Herald started consolidating positions. Most of the ADD employees found alternate positions by

mid-May, although, at that time, there were still ADD employees searching for other positions within the company. Nevertheless, the Herald stated that displaced ADD employees would be given until the "end" of 1996 to find other positions.

Then, on June 20, 1996, Parris's home was burglarized. Parris was assaulted brutally when he tried to protect himself and his family. He suffered severe facial injuries, including a broken jaw, facial lacerations, and associated injuries. One of his family members called the Miami Herald the evening of the attack to inform the Herald that Parris was severely injured and in the hospital.

Parris was hospitalized for surgery between June 20-22, 1996. Dr. Eisner, an oral and maxillofacial specialist, performed surgery on Parris and wired his jaw shut for four weeks to facilitate healing. Following surgery, his treatment was slow and painful: His doctor had wired his jaw shut with both vertical and horizontal wires from June 22 - July 10, during which time he could not speak or eat solid foods. Once the doctor removed the vertical wires on July 10, 1996, he could theoretically open his mouth to speak and eat solid food; however, his jaw muscles atrophied during this period and required a period of healing before they could function normally. The blow to Parris's mouth broke and knocked out several teeth, leaving him with exposed nerves in his mouth until his dentist, Dr. Gordon Chiu, could fit him with a dental bridge. The horizontal wires remained in his jaw until July 31, 1996.

Clara Ortega, the Herald's employee health nurse, administered FMLA benefits for the Herald. On July 11, 1996, she mailed Parris the Herald's standard "FMLA Designation Form" and a cover letter advising him that he was eligible for FMLA leave. However, she sent the correspondence to a former address, so the Post Office returned it a few days later. On July 15, 1996, Ortega sent a second letter with a new form to the correct address. Parris filled out the form and sent it back on July 24, 1996. Pursuant to requests from the Herald for the details of Parris's injuries and rehabilitation, Parris also asked Dr. Eisner, his surgeon, and Dr. Gordon Chiu, his dentist, to outline the many treatments he received following his surgery on June 20, 1996, and Parris sent that information to Ortega as well.

On July 31, 1996, the Herald terminated Parris. However, the Herald continued to employ at least one other ADD worker situated similarly to Parris until 1997, even though he had not located alternate employment within the company and would not continue to work in the restructured ADD division.

The district court determined that Parris's job termination was "fully documented and scheduled" for July 31, 1996 due to the restructuring effort, and therefore, as an at-will employee, the Miami Herald could discharge him without violating the FMLA. The district court observed that the FMLA cannot put an employee in any better or worse position than he or she would have been in had the

FMLA not been enacted. The district court quoted the following in support of its ruling from <u>Gunnell v. Utah Valley State College</u>, 152 F.3d 1253, 1262 (10th Cir. 1998):

> [A]n employee who requests leave or is on leave has no greater rights than an employee who remains at work. <u>See</u> 29 C.F.R. § 825.216(a). For this reason, an employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request. <u>Cf.</u> 29 C.F.R. § 825.216(a) (noting that employee may be laid off or refused return to shift that has been eliminated, as long as the action would have been taken in the absence of FMLA leave)[.]

On this basis, the district court disposed of the case.

## II.   DISCUSSION

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P.  56(c).  In assessing a summary judgment motion, we must examine the evidence in the light most favorable to the nonmoving party. <u>See</u> <u>Hilburn v. Murata Elecs. N. Am., Inc.</u>, 181 F.3d 1220, 1225 (11th Cir. 1999).

The FMLA provides eligible employees with "a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  To state a claim under the FMLA, a plaintiff must prove

three elements at trial: (1) he availed himself of a protected right under the FMLA; (2) he suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision. See Earl v. Mervyns, Inc., 207 F.3e 1361, 1367 (11th Cir. 2000). On summary judgment, however, the employee must raise only a material issue of fact, which he may generate through reasonable inferences, regarding each element of his claim.[1]

The central question before this court is whether Parris has raised a factual dispute as to whether he qualified for a right to reinstatement under the FMLA, 29 U.S.C. §§ 2614(a)(1), 2615(a)(1), and if so, whether the Herald violated that right. The district court summarily determined that the Herald planned and scheduled Parris's termination in advance of his decision to take FMLA leave. An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed with the company during the FMLA leave period. See 29 C.F.R. § 825.216(a); O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1354 (11th Cir. 2000). Because the district court found no

---

[1]At trial, the Herald must prove that its decision was unrelated to Parris's FMLA-protected sick leave. Under the FMLA regulations, if an employer interferes with an employee's right to reinstatement under the FMLA, the employer bears the burden of proving that the employee would have been laid off during the FMLA period for reasons unrelated to the employee's condition, and therefore is not entitled to restoration. See 29 C.F.R. § 825.216(a) (1999); O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1354 (11th Cir. 2000).

genuine dispute of fact about the Herald's plan to terminate Parris, it held that the FMLA does not provide Parris with a right to reinstatement.

Here, we address only whether a genuine dispute exists over Parris's qualification for a right to reinstatement under the FMLA. Because the district court did not address the parties' other arguments regarding the first element of Parris's FMLA claim, we assume for purposes of this analysis that Parris survived summary judgment on these issues.[2]

Our review of the case discloses that there is a material, genuine dispute regarding whether Parris had a right to reinstatement. Parris has presented sufficient evidence to raise a genuine issue of material fact on two questions: (1) whether prior to his attack on June 20, 1996 the Herald had slated Parris's position as ADD distribution manager for elimination on any specific date; and (2) whether the Herald

---

[2]We remand for further consideration of Parris's qualification for FMLA-protected leave. The Herald argues in its brief that Parris had not engaged in a protected activity because he did not suffer a "serious health condition" qualifying him for FMLA leave, did not properly notify the Herald of his need for FMLA leave, and did not abide by the proper certification procedures under the FMLA and the Herald sick pay policy. Under the FMLA, if an employee takes leave pursuant to § 2612(a)(1)(D), the employer may request "certification" issued by the health care provider of the eligible employee. Certification is sufficient if it states the date on which the serious health condition commenced, the probable duration of the condition, the appropriate medical facts within the knowledge of the health care provider regarding the condition, and a statement that the employee is unable to perform the functions of the position of the employee. 29 U.S.C. § 2613(a)-(b). Furthermore, on remand, the district court should reconsider the applicability of the Herald's sick pay policy in light of this decision.

would have terminated his employment with the Herald on July 31, 1996 if Parris had never been absent for the weeks he took sick leave.[3]

The Herald takes the position that it scheduled Parris for discharge on July 31, 1996, prior to his injury. Therefore, it argues, the FMLA does not prevent the Herald from terminating Parris when it did. Parris disputes the Herald's claim and argues that the Herald would have retained him in its employment until a later date in the year had he not been hospitalized and subsequently absent from work for six weeks.

We look to the evidence in the record to determine whether Parris has raised a reasonable inference that the Herald would not have terminated Parris from employment on July 31, 1996 had he not taken sick leave to recover from his injuries. The record raises an inference that the Miami Herald would not have terminated Parris prior to September 13, 1996, and as a factual matter, that the Herald would not have terminated Parris prior to the end of the year, or longer, if he had worked continuously for the company.

First, Parris has revealed the self-contradictory nature of the Miami Herald's records of his "scheduled" termination. Parris has presented two conflicting Miami Herald Personnel Action Reports. One report is dated July 31, 1996 and lists Parris's

---

[3]We adopt appellant's distinction between his position as a manager in the ADD and his job with the Miami Herald. Because his employment could continue uninterrupted if he transferred to a different position, we do not view the termination of his position as equivalent to the termination of his employment with the Herald.

termination date as September 13, 1996. The other is dated November 26, 1996, and it lists Parris's position as terminating on September 15, 1996. The two personnel action reports conflict with the Herald's claim that it had fixed an exact date for terminating Parris's position prior to his absence. No report suggests that the Herald would terminate Parris's position on July 31, 1996.[4] Nor does the record contain personnel documents dated *prior* to July 31, 1996 that designate any specific date for Parris's termination.

Second, Parris has demonstrated that no Herald employee ever informed him that his job was scheduled for termination on July 31, 1996. None of Parris's supervisors at the Herald stated that, prior to his absence, he or she intended to discharge Parris by July 31, 1996 if Parris had not located an alternate job by that time. According to the record, no one at the Herald who might have been aware of the date of Parris's termination ever informed Parris of such a date.

Finally, Parris has raised a dispute about the Herald's "cut off" date for ADD employees who did not locate alternate positions after their former ADD positions were consolidated, and he has shown that at least one other similarly situated ADD

---

[4]Although Dory Owens Trinka's declaration states that a personnel action report was prepared and signed by her "with a projected termination date of July 31, 1996," there does not appear to be such a document in the record. See Supplemental App. at Tab 32, ¶¶ 11, 14. See also Supplemental App. at Tab 33, ¶ 3 ("At some point, Mr. Gonzalez [Parris's supervisor] also told me that Mr. Parris's job would be ending on July 31 as part of a restructuring . . . .").

employee kept his job for at least six months longer than Parris.[5] Parris has shown that the Herald's stated position was to retain displaced ADD employees until the end of the year and to assist them in relocating within the company.[6] Although not guaranteeing alternate positions for those displaced, Carole Phipps, Manager of Organizational Development and Training at the Herald, did testify by affidavit that "[i]t wasn't the purpose [of the restructuring] to lay off." App. at Tab 17, p. 15. The record reflects that the Herald was retaining employees for an indefinite period of time while they searched for other positions within the company. It appears that the Herald retained people in its employ after their old positions officially terminated. At least one other ADD employee, Mr. Arthur Exul, transferred from the ADD to a new position within the Herald on February 12, 1997, despite the fact that the Herald had not slated him to remain within the newly restructured ADD.[7]

---

[5]The record does not definitively establish the formal completion of the restructuring. The Herald announced a "target date" for completion of July 31, 1996, however, Jose Gonzalez stated in his declaration that the Herald expected the restructuring to finish in August 1996. Oddly, Arthur Exul, an ADD manager who had to find alternate employment with the Herald or leave prior to completion of the restructuring, remained in the ADD until February 12, 1997. This evidence may indicate that the restructuring continued through 1997.

[6]The Miami Herald – acting through Dory Owens Trinka and Donna Sasser, the head managers of the ADD – assured the ADD employees that the Miami Herald would make every effort to reassign all affected employees to other jobs within the Miami Herald. This statement was followed by a written memorandum distributed to all ADD employees.

[7]The record does not expressly state when Arthur Exul's original position in the ADD terminated, merely that he was not one of the six managers chosen to remain in ADD. He was transferred to another "cost center" on June 3, 1996, the same day that Parris and other ADD employees who would not remain in the ADD were transferred. The significance of this transfer, for purposes of

## III.  CONCLUSION

On this record, we hold that a genuine dispute exists as to whether the Herald had scheduled Parris's termination prior to the time he took sick leave.  A jury could determine that in the circumstances, Parris, absent injuries, would have worked beyond July 31, and therefore, his request for and entitlement to FMLA leave is causally related to the decision of the Miami Herald to discharge him.  Accordingly, we REVERSE the dismissal on summary judgment and REMAND for further proceedings consistent with this opinion.

---

determining whether Exul was employed in the same capacity as prior to the transfer, is not clear from the record.  Appellee's brief states that the Herald's transfer of both Exul and Parris, on June 3, 1996, was a phase of the restructuring process with no significance other than moving the employees out of a defunct cost center.