Rosemary J. WASCURA, Plaintiff-Appellant,

v.

CITY OF SOUTH MIAMI, a municipal corporation, Neil Carver, individually, et al., Defendants-Appellees.

No. 00-14177.

United States Court of Appeals,

Eleventh Circuit.

July 17, 2001.

Appeal from the United States District Court for the Southern District of Florida.(No. 97-02521-CV-UUB), Ursula Ungaro-Benages, Judge.

Before ANDERSON, Chief Judge, and FAY and BRIGHT[*], Circuit Judges.

ANDERSON, Chief Judge:

Plaintiff-Appellant Rosemary Wascura ("Wascura") appeals from an order of the district court granting summary judgment in favor of the Defendant-Appellee, the City of South Miami ("the City"), on her claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* ("ADA"), and the Family Medical and Leave Act of 1993, 29 U.S.C. § 2601 *et seq.,* ("FMLA"). Wascura originally brought this action against the City and four individual Defendants—Neil Carver, former Mayor of the City; R. Paul Young, former Vice Mayor of the City; and Ann Bass and Thomas Todd Cooper, former City Commissioners—alleging violations of the ADA and FMLA. The individual Defendants brought a motion to dismiss Wascura's FMLA claim against them in their individual capacities, but the district court denied their motion. On interlocutory appeal, we reversed, holding that public officials in their individual capacities are not "employers" under the FMLA and, therefore, we concluded that we had no subject matter jurisdiction over Wascura's FMLA claim against the individual Defendants. *See Wascura v. Carver,* 169 F.3d 683 (11th Cir.1999). On remand, the district court granted the City's motion for summary judgment as to both claims, and Wascura appeals. For the reasons stated below, we affirm.

## I. BACKGROUND

Wascura worked as City Clerk from August 1981 until her termination on May 16, 1995. Under the City's charter, the City Clerk was an appointee who served at the pleasure of a five-member Commission, consisting of the Mayor, Vice-Mayor, and three other Commissioners. A majority vote of the Commissioners

---

[*]Honorable Myron H. Bright, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

was required in order to terminate the City Clerk.

At the time of Wascura's termination, the five-member Commission consisted of Mayor Neil Carver, R. Paul Young, Ann Bass, Thomas Todd Cooper, and Thomas Cunningham (collectively, "the Commissioners"). Carver served as Commissioner from February 1990 until February 1994 and served as Mayor of the City from February 1994 until February 1996. Young served as Commissioner from February 1994 until February 1996; Bass served as Commissioner from February 1992 until February 1996; and Cooper served as Commissioner from February 1990 until February 1996. According to Wascura's deposition testimony, Cunningham, who was never a party to this action, was HIV positive and died subsequent to Wascura's termination.

In August 1994, Wascura's twenty-seven year old son, who was experiencing the end-stages of AIDS and was unable to care for himself, moved in with Wascura and her family. According to Wascura's deposition testimony, in January 1995, she notified each Commissioner about her son's illness and the possibility that she might need to take time off from work in order to care for her son. Wascura testified with respect to their responses that several Commissioners, including Mayor Carver, Cunningham, and Bass, expressed sympathy. She also testified that she did not receive any negative verbal reaction or signs of displeasure from any of the Commissioners when she told them about her son's illness. Wascura further testified that between January 1995, when she notified the Commissioners of her son's illness, and May 16, 1995, when she was terminated, she took some time off from work to be with her son, but she could not remember taking off "any large blocks of time."

According to Wascura's deposition testimony, on Friday, May 12, 1995, Mayor Carver asked Wascura to come to his office. Wascura arrived at Carver's office, where the City's labor attorney, Jim Crosland, was also present. Mayor Carver told Wascura that he wanted her to resign immediately. Wascura testified that Carver told her that he did not have to give her a reason for wanting her resignation, and he said, "Things aren't right. I don't want you here. I want you to resign. And if you need an excuse, you can use what's going on at home."

Between May 12 and May 16, Wascura contacted each of the other Commissioners to tell them that Mayor Carver had asked for her resignation. Prior to the Commission meeting on May 16, Wascura told Mayor Carver that she refused to resign. At the Commission meeting, Mayor Carver made a motion for Wascura's termination, which passed by a unanimous vote of 5 to 0.

Wascura then filed this action, alleging violations of the ADA, 42 U.S.C. § 12101 *et seq.,* and the

FMLA, 29 U.S.C. § 2601 *et seq.* In granting the City's motion for summary judgment on her ADA claim, the district court first noted that Wascura failed to produce any direct evidence of discrimination. The district court then analyzed Wascura's ADA claim under the *McDonnell-Douglas*[1] burden-shifting analysis and concluded that Wascura failed to adduce any evidence suggesting that the City's proffered, non-discriminatory reasons for the Commission's decision to terminate her were pretextual. In granting the City's motion for summary judgment on her FMLA claim, the district court held that Wascura failed to provide the City with notice of her intention to take FMLA-qualifying leave sufficient to invoke her FMLA rights. The district court also held that Wascura failed to establish a prima facie case of interference with her FMLA rights, because she never exercised or attempted to exercise her right to take FMLA-leave.

## II. STANDARD OF REVIEW

We review the district court's order granting summary judgment *de novo.* *See Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1357 (11th Cir.1999). "Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* at 1358 (citing Fed.R.Civ.P. 56(c)). We review the record and draw all reasonable inferences in the light most favorable to the non-moving party. *See id.*

## III. DISCUSSION

A.    ADA Claim

The ADA mandates that covered employers shall not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the Act, the term "discriminate" is defined to include, among other factors, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4).

In the absence of direct evidence of discrimination,[2] a plaintiff may establish a prima facie case of

---

[1]*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

[2]We agree with the district court that Wascura has failed to provide any direct evidence of discrimination. *See Denney v. City of Albany,* 247 F.3d 1172, 1182 (11th Cir.2001) ("Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption.") (quoting *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998)); *Damon,* 196 F.3d at 1359 (" '[O]nly the most blatant remarks, whose intent could be nothing

an ADA violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases. *See Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d 1220, 1226 (11th Cir.1999). A plaintiff attempting to establish a prima facie case of "association discrimination" under the ADA must establish: (1) that she was subjected to an adverse employment action; (2) that she was qualified for the job at that time; (3) that her employer knew at that time that she had a relative with a disability; and (4) that "the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a determining factor in [the employer's] decision." *Id.* at 1230-31.

Once a plaintiff establishes a prima facie case of discrimination, the defendant-employer must articulate a legitimate, non-discriminatory reason for the challenged action. *See Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir.2000) (en banc). "However, the employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.' " *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254-55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)).

"If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision'." *Id.* (quoting *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997)). If the plaintiff fails to proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual, the defendant is entitled to summary judgment. *See id.* at 1024-25.

Assuming *arguendo* that Wascura has established a prima facie case, we conclude that she has failed to adduce sufficient evidence from which a reasonable jury could find that the City's proffered, non-discriminatory reasons for her termination were pretextual. Because each Commissioner testified as to his or her own reasons for voting to terminate Wascura, we examine each Commissioner's proffered reasons

other than to discriminate ...' will constitute direct evidence of discrimination.") (quoting *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081-82 (11th Cir.1990)). Mayor Carver's statement to Wascura on May 12, 1995—"Things aren't right. I don't want you here. I want you to resign. And if you need an excuse, you can use what's going on at home"—is at most weak circumstantial evidence of discrimination.

separately. We then examine Wascura's attempts to show that such reasons were pretextual.

*Mayor Carver*

Carver testified that, prior to being elected Mayor, he had formed an opinion that Wascura could not be trusted, "[b]ased on her personality and demeanor and dealing[s] with other people." Carver testified that his initial judgment about Wascura was confirmed when he heard complaints about her performance as City Clerk. For example, Edward Cox, the City Manager from November 1994 until November 1996, had complained to Carver that Wascura had distributed incorrect and outdated information at a meeting concerning the annexation of City property.[3] Carver also testified about complaints that Wascura was selling hand bags out of the Clerk's office and that she had purchased a lamp for her personal use and charged it to a city account. Carver testified that, even though she reimbursed the city for the lamp, she did not have to pay sales tax because the city is exempt from having to pay sales tax. He also testified that Wascura charged courier services to a city account, for which the City was never reimbursed. Carver further testified that Wascura signed his name to documents she was not supposed to sign for him and that she worked for outside organizations while she was supposed to be working for the City. Carver testified that his "political judgment" precipitated the timing of the meeting when he asked Wascura for her resignation. He testified that he had waited until that time to seek her resignation, because he thought that he might get enough votes for her termination if she refused to resign. Carver stated that he did not give Wascura a reason for why he was seeking her resignation, because he did not want to give her the opportunity "to manipulate things" and to "twist" what he said.

*Cooper*

Cooper testified that he was a personal friend of Wascura and her husband, but that he believed that it was in the best interest of the City for Wascura to resign. He formed this belief after Edward Cox, the City Manager, and Earl Gallop, the City Attorney, told Cooper that "they had lost trust in [Wascura] and her ability

_____

[3]Cox testified that his dealings with Wascura deteriorated after the annexation meeting where Wascura disseminated incorrect information, and he testified that he spoke with the Mayor and the other Commissioners about this matter. Cox testified that Wascura's information was both incorrect and outdated. It was his opinion that Wascura was close to a faction in the City that was opposed to annexation and that that had something to do with her distribution of the erroneous information. He also testified that gathering and distributing such information was not in her realm of responsibility. Further, it was his opinion that she had to have known both that it was not her responsibility and that the information was not accurate. Cox testified that he confronted Wascura, asked her why she did this, and told her not to interfere in matters within his jurisdiction. He also testified that he was aware that Mayor Carver and several other Commissioners were not pleased with Wascura and that, "[i]n most every city commission meeting, [the Commissioners] would bring up issues of shortcomings of the city clerk."

to do her job" after Wascura had disseminated incorrect information at an annexation meeting against the wishes of the City Manager. This meeting with Cox and Gallop took place within a month of Wascura's termination. Cooper also recalled hearing Mayor Carver complain about Wascura's performance as City Clerk. He testified that he could tell that Carver "was exasperated or angry at the kind of the quality of the work that was being produced."

*Bass*

Bass testified that she believed that Wascura was unqualified to perform her duties as City Clerk because she "lacked some of the integrity necessary for the position." One instance in which Commissioner Bass found Wascura lacking integrity was when Wascura called Bass aside to tell her something that another Commissioner was planning to talk about at an upcoming Commission meeting. This occurred sometime between two years and six months prior to Wascura's termination. Bass believed that Wascura's action constituted a violation of Florida's Sunshine law. Bass also believed that Wascura's purchase of a lamp for her personal use through a city account demonstrated her lack of integrity. This purchase apparently occurred sometime around November 1994, approximately six months before Wascura's termination. Bass testified that she never confronted Wascura to discuss her concerns about Wascura's lack of integrity because she was "not good at that" and "just removed [herself] from it." Bass claimed that, because of her concerns about Wascura's integrity, she "pull[ed] back from official dealings with [Wascura] and just maintain[ed] an acquaintanceship" with her.

*Young*

Young, who was the fifth member of the Commission to vote for Wascura's termination, testified that he was surprised that the motion to terminate Wascura was made at the meeting on May 16, 1995. He had previously advised Wascura that, if she could not work things out with the Mayor, she should try to "cut [her] best deal," and he thought that she would resign and negotiate "a package." Thus, when he realized at the meeting on May 16 that Wascura had decided to refuse to resign and instead "to go to a public confrontation with the Commission," he was "stunned." Young testified that he decided to vote for Wascura's termination in order to avoid a public confrontation.

*Wascura's Attempts to Show Pretext*

In response to the City's articulated reasons for the Commission's decision to terminate her, Wascura offered evidence in an attempt to show that these reasons were pretextual. She first pointed to the temporal proximity between the date that she notified the Commissioners of her son's illness—January 1995—and the

date that she was terminated—May 16, 1995.  While a close temporal proximity between two events may support a finding of a causal connection between those two events, *see Brungart v. BellSouth Telecommunications, Inc.,* 231 F.3d 791, 799 (11th Cir.2000) (stating that the "general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection"), the three and one-half month period between Wascura's notification to the Commissioners of her son's illness and her subsequent termination does not, standing alone, show that the City's articulated reasons for her termination were pretextual, *see, e.g., Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997) (holding that four-month time lag between plaintiff's participation in protected activity and his termination was, by itself, insufficient to justify an inference of causation);  *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) (affirming district court's holding that three-month period of time between plaintiff's protected activity and termination was, standing alone, insufficient to establish a causal connection).  *Cf. Donnellon v. Fruehauf Corp.,* 794 F.2d 598 (11th Cir.1986) (in a case where "the defendant's witnesses never articulated clearly and consistently the reason that the plaintiff was discharged," holding that there was substantial evidence that the plaintiff was discharged in retaliation for filing a sex discrimination complaint, including the fact that she was discharged less than one month after filing her complaint).

In a somewhat related argument, Wascura contends that the fact that her alleged misconduct, about which the Commissioners testified, pre-dated her notice to the Commissioners of her son's illness shows that the City's proffered reasons for her termination were pretextual.  We disagree.  First, Mayor Carver testified that he chose to wait until May 1995 to seek Wascura's resignation because it was not until then that he thought that he might be able to get enough votes to terminate her if she refused to resign.  Bass testified that she chose not to discuss her "integrity" concerns with Wascura because she was not "good at that" and she instead chose to remove herself from dealings with Wascura.  Cooper testified that he did not learn of the City Manager's and City Attorney's lack of trust in Wascura until one month prior to Wascura's termination.  Finally, Young testified that he voted to terminate Wascura, not because of her alleged misconduct, but rather because he wanted to avoid a public confrontation.  Therefore, the fact that Wascura's alleged misconduct, about which Carver, Bass, and Cooper testified, might have predated Wascura's notice to the Commissioners of her son's illness does not appreciably contribute to a showing that the City's proffered reasons for her termination were pretext for discrimination.

Wascura next points to her long period of employment with the City and the lack of documentary evidence of any complaints concerning her performance as evidence that the City's proffered reasons for her termination were pretextual. While the lack of complaints or disciplinary reports in an employee's personnel file may support a finding of pretext, *see Stanfield v. Answering Serv., Inc.,* 867 F.2d 1290, 1294 (11th Cir.1989), it is undisputed that there was no formal review process of the City Clerk. The only performance reviews that Wascura submitted as evidence of her good performance were completed in 1979 and 1980, while Wascura was serving as Deputy City Clerk. Furthermore, while Wascura had served as City Clerk for fourteen years, Carver, Young, Bass, and Cooper had served on the Commission for a much shorter period of time.

As evidence of pretext, Wascura next points to Carver's failure to give her a reason why he wanted her to resign at the meeting on May 12, 1995, and the Commission's failure to give her a reason for her termination on May 16, 1995. In support of this argument, Wascura cites *Donnellon v. Fruehauf Corp.,* 794 F.2d 598 (11th Cir.1986). However, in *Donnellon,* a case which was adjudicated at a bench trial, "the defendant's witnesses never articulated clearly and consistently the reason that the plaintiff was discharged." *Id.* at 601-02. There was also substantial evidence in *Donnellon* that the defendant had discharged the plaintiff in retaliation for her filing a sex discrimination complaint. *See id.* at 601.

In this case, by contrast, Carver testified that he chose not to give Wascura a reason why he wanted her resignation, because he did not want to give her an opportunity "to manipulate things" and to "twist" what he said. As discussed above, he also testified as to his numerous reasons for voting to terminate her. This is not a case where "the defendant's witnesses never articulated clearly and consistently the reason that the plaintiff was discharged." *See id.* at 601-02. Instead, each of the Commissioners testified as to his or her reasons for voting to terminate Wascura.

It is also significant in this case that Wascura has been able to adduce virtually no evidence of discriminatory intent. To the contrary, Wascura herself testified in deposition that she remembered several of the Commissioners expressing sympathy, and none of the Commissioners expressing displeasure, when she told them that her son had AIDS and that she might need some time off. There is absolutely no evidence that any Commissioner exhibited fear with respect to Wascura's association with her diseased son or otherwise indicated any discriminatory animus. The only hint is Mayor Carver's alleged statement to Wascura when he asked for her resignation—that, if she "need[ed] an excuse, [she could] use what's going

on at home."  As discussed in note 2, *supra,* this statement is at most weak circumstantial evidence of any discriminatory intent on the part of Mayor Carver.  On its face, the statement attributed by Wascura to the Mayor does not suggest that the decision to terminate her was influenced by Wascura's son's illness, but rather that the termination decision was being made for other reasons, and that Wascura might save face by using her son's illness as the excuse for her resignation.  Moreover, Wascura was pressed at her deposition as to whether or not Mayor Carver indicated that her son's illness influenced his decision.  She admitted that he never said that.  In her deposition, Wascura was repeatedly asked direct questions to this effect;  she repeatedly answered in the negative.  For example, in one such question, counsel asked:  "But he never said to you, look, I don't approve of people who contract the AIDS virus.  I want you out of here."  Wascura answered:  "Oh, no, he never said that."

Later in her deposition, Wascura asserted that she had concluded in her own mind that the decision was in fact influenced by her son's illness, because she saw no other reasons for the decision and because of the temporal proximity.  However, as noted above, there are ample legitimate reasons reflected in this record.  Indeed, Commissioner Cooper, who considered himself a personal friend of Wascura and her husband, testified that when she called him shortly before the May 16 public meeting at which Wascura was terminated, he told her that he was sorry because he considered her a friend, but that he felt at this point that it was the best thing for the City for her to resign because the City Manager and City Attorney had lost confidence in her.  He also testified that he had made the same comments and given the same reasons at the May 16 public meeting.  Later questioning of him in deposition indicated that the minutes of that meeting corroborate the fact that he had made reference to the loss of trust in Wascura.

In light of the ample legitimate reasons for the termination decision proffered by the City, the truth of which was never effectively challenged, and in light of the fact that Wascura adduced virtually no evidence of discrimination, we cannot conclude that a reasonable jury could find for the Plaintiff based merely on the three and one-half month temporal proximity and the very weak inference from the Mayor's alleged comment that Wascura could use the illness as a face-saving excuse.  After a careful analysis of the entire summary judgment record, we cannot conclude that Wascura has adduced evidence to generate a genuine issue of fact as to the reasons proffered by the City for Wascura's termination.  *Cf. Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit

the trier of fact to conclude that the employer unlawfully discriminated").

Finally, Wascura argues that the fact that none of the Commissioners besides the Mayor intended to seek her termination shows that they merely "rubber-stamped" the Mayor's recommendation, without any independent investigation into the reasons for her discharge. We conclude that what happened here does not support a finding of pretext. "We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon,* 196 F.3d at 1361 (internal citations omitted). Therefore, even if the Commissioners did in fact merely "rubber-stamp" the Mayor's recommendation that Wascura be terminated, this alone is insufficient to show pretext for discrimination. This is not a case in which a plaintiff has created a jury issue with respect to discrimination on the part of a dominant decision-maker whose decision was rubber-stamped by others.

Viewing the record as a whole, we conclude that Wascura has failed to come forward with sufficient evidence to convince a reasonable jury that the City's proffered reasons for terminating Wascura were pretext for discrimination. Accordingly, we affirm the district court's order granting summary judgment to the City on Wascura's ADA claim.

B.      FMLA Claim

Under the FMLA, an eligible employee is entitled to up to twelve weeks of leave each year to care for the employee's child, spouse, or parent who has a serious health condition. *See* 29 U.S.C. § 2612(a)(1).[4] "To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, *see* 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c)." *Strickland v. Water Works and Sewer Bd. of the City of Birmingham,* 239 F.3d 1199, 1206 (11th Cir.2001).

Wascura claims that the City violated the FMLA when it terminated her a few months after learning of her intent to take leave to care for her son and prior to the time that she took her intended FMLA-leave.

---

[4]It is undisputed that Wascura was an eligible employee and that her son had a serious health condition.

While the City argues that Wascura's claim is really one for retaliation, we, like the district court, accept Wascura's characterization of her FMLA claim as one for interference with her FMLA rights. We conclude that the district court's order granting summary judgment to the City on Wascura's FMLA claim was appropriate.

"To state a claim under the FMLA, a plaintiff must prove three elements at trial: (1) he availed himself of a protected right under the FMLA; (2) he suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision." *Parris v. Miami Herald Publ'g Co.,* 216 F.3d 1298, 1301 (11th Cir.2000) (citing *Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1367 (11th Cir.2000)). "On summary judgment, however, the employee must raise only a material issue of fact, which he may generate through reasonable inferences, regarding each element of his claim." *Id.*

It is undisputed that Wascura suffered an adverse employment action. With respect to the first element—that she availed herself of a protected right—we assume *arguendo,* but expressly do not decide, that Wascura raised a genuine issue of material fact. However, we conclude that she failed to raise a genuine issue with respect to the third element—causation. For the same reasons that we concluded that Wascura failed to present evidence from which a reasonable jury could find that the City's proffered reasons for her termination were pretextual with respect to her ADA claim, we conclude that Wascura failed to present evidence from which a reasonable jury could find any causal connection between Wascura's notice to the Commissioners in January 1995 of her potential need to take time off to care for her son and her subsequent termination on May 16, 1995. As explained above, the City adduced evidence of legitimate reasons for its termination action unrelated to Wascura's indication that she might want to take time off in the future to care for her son, and Wascura failed to create a genuine issue of fact with respect to any causal connection between her notice to the Commissioners of her potential need to take time off because of her son's AIDS and her termination. Aside from the temporal proximity, Wascura introduced virtually no evidence of a causal connection. In light of the other evidence in the record, the three and one-half month temporal proximity is insufficient to create a jury issue on causation. We conclude that Wascura failed to adduce sufficient evidence to permit a reasonable jury to find for her.

## IV. CONCLUSION

Wascura failed to adduce sufficient evidence from which a reasonable jury could find that the reasons proffered by the City for her termination were pretextual. She also failed to present evidence from which a

reasonable jury could find that the notice that she gave to the Commissioners of her potential need to take time off in the future to care for her son was in any way causally related to the City's decision to terminate her. Therefore, the district court properly granted summary judgment in favor of the City on Wascura's ADA and FMLA claims.

AFFIRMED.