[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14610
Non-Argument Calendar

_____

D.C. Docket No. 5:10-cv-00083-LGW-JEG

DOUGLAS ENERGY RELIEF ASSOCIATION,
a.k.a. D.E.R.A., et al.,

Plaintiffs,

VERA FREEMAN,

Plaintiff-Appellant,

versus

CITY OF DOUGLAS, GEORGIA,
CITY COMMISSIONERS,
Individually in Official and Private & Un-Private Capacities;
Present and Past,
FORMER 2004 YEAR MAYOR,
Individually in Official and Private and Un-Official Capacities,
100 JOHN DOES,
PRESENT MAYOR JACKIE WILSON,
Individually in Official and Private Capacities, et al.,

Defendants-Appellees.

---

Appeal from the United States District Court
for the Southern District of Georgia

---

(February 20, 2014)

Before HULL, PRYOR and MARTIN, Circuit Judges.

PER CURIAM:

Plaintiff Vera Freeman sued defendants the City of Douglas, Georgia, the City Commissioners, two City mayors, and many "John Does" (collectively referred to as "the City") for alleged discrimination against the City's black residents through fraudulent electrical billing practices.

The district court granted the City defendants' motion for summary judgment on all of plaintiff Freeman's claims. Plaintiff Freeman now appeals.[1] After review of the record and the parties' briefs, we affirm.

## I.     BACKGROUND

In her complaint, plaintiff Freeman alleged that the City discriminated against its black residents through its electricity billing practices. Freeman alleged that the City inflated its black residents' electricity bills by fraudulently overstating the number of kilowatt-hours that the City's black residents consumed.   To be

---

[1]Plaintiff Douglas Energy Relief Association ("DERA") also sued the City defendants for the same claims in the district court. However, DERA did not appeal.

2

clear, Freeman did not allege that the City charged its black residents a higher rate for each kilowatt-hour consumed. Instead, Freeman alleged that the City stated that its black residents consumed more kilowatt-hours of electricity than they actually did. Freeman alleged that the City inflated black residents' electrical bills—and, thus, made the City's black residents pay excessive electrical bills—because of their race.

Based on these allegations, Freeman filed a housing discrimination complaint with the U.S. Department of Housing and Urban Development ("HUD"). In her HUD complaint, Freeman alleged that the City, inter alia, "overcharged and unfairly charged them fees" related to their electric bills. HUD investigated those allegations and "determined that no reasonable cause exists to believe that a discriminatory housing practice ha[d] occurred." Based on this conclusion, HUD issued a "Determination of No Reasonable Cause" and informed Freeman of her right to file a civil action.

Freeman exercised her right to file a civil action and sued the City in federal court. She brought these federal claims:[2] (1) a race-based discrimination claim pursuant to 42 U.S.C § 1983 for violation of her Fourteenth Amendment equal protection rights and (2) a race-based discrimination claim pursuant to Title VIII of

---

[2]Because plaintiff Freeman filed a "shotgun complaint," the district court ordered her to clarify the claims raised in the complaint. We list the claims that plaintiff Freeman raised in response to the district court's order to clarify the complaint.

3

the Civil Rights Act of 1968, as amended by the Fair Housing Act ("FHA"). Freeman also brought these state law claims: (3) fraud; (4) misrepresentation; (5) breach of contract; (6) negligence; and (7) intentional infliction of emotional distress.

In support of her claims, Freeman produced nearly 2,000 pages of documents for the district court. The vast majority of those documents were (1) utility bills that the City sent to various residents for various billing periods and (2) correspondence between plaintiff Freeman, the Douglas Energy Relief Association, City residents, and/or HUD.

After the close of discovery, the City moved for summary judgment on all claims raised in the complaint. The district court granted the City's motion. The court stated that it "review[ed]—page by page—the specific documents cited by Plaintiff" and concluded that Freeman "utterly and completely failed to support [her] allegations with evidence." The district court concluded that Freeman failed to produce evidence that—at least with respect to electricity consumption—the City's black residents were similarly situated to the City's non-black residents. Without some evidence that the City's black and non-black residents were similarly situated, the district court concluded that there was insufficient evidence supporting Freeman's § 1983 and FHA claims. Thus, the district court granted the

4

City's motion for summary judgment on Freeman's federal race-based discrimination claims.

Because Freeman's state law claims were predicated on the City's alleged race-based discrimination, which was unsupported by the evidence, the district court also granted the City's motion for summary judgment on Freeman's state law claims.

Plaintiff Freeman appeals.

## II.    STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. Morales v. Zenith Ins. Co., 714 F.3d 1220, 1226 (11th Cir. 2013). When reviewing the evidence, we view all facts in the light most favorable to the non-moving party. Id.

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

### III.    DISCUSSION

To state a § 1983 equal protection claim, plaintiff Freeman must show that she is similarly situated to non-black persons who received more favorable treatment.  See Sweet v. Sec'y, Dep't of Corr., 467 F.3d 1311, 1318-19 (11th Cir. 2006) ("To establish an equal protection claim, a [plaintiff] must demonstrate that (1) he is similarly situated to [others] who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis."); Jones v. Ray, 279 F.3d 944, 946–47 (11th Cir. 2001) (stating that, to establish an equal protection violation, a plaintiff must show, among other things, that "he is similarly situated" to others who received more favorable treatment).  Specifically, plaintiff Freeman must show that the City overstated the number of kilowatt-hours of electricity that she consumed but the City did not overstate the number of kilowatt-hours of electricity that similarly-situated, non-black residents consumed.

Freeman's FHA race-based discrimination claim requires the same showing. See Schwarz v. City of Treasure Island, 544 F.3d 1201, 1216 (11th Cir. 2008) ("[A] disparate treatment claim [pursuant to the FHA] requires a plaintiff to show that he has actually been treated differently than similarly situated [non-black] people.").

6

On appeal, Freeman directs this Court to these portions of the record:  (1) a comparison chart reflecting the electric bills of the City's residents; (2) an analysis of the City's electric bills, which shows that black City residents use more electricity than the national and state averages; (3) the City's responses to Freeman's interrogatories; (4) plaintiff Freeman's responses to the City's interrogatories; (5) Roy Wadley's expert witness report; (6) Willis Papillion's expert witness report; and (7) an affidavit from a civil rights analyst, Edward Freeman.

We address each item below and explain why that evidence, viewed in plaintiff Freeman's favor, fails to establish that Freeman was similarly situated to any non-black persons who received more favorable treatment with respect to their electric bills.  Specifically, Freeman's evidence does not show that the City charged Freeman with using more kilowatt-hours of electricity than she actually used but did not over-charge similarly-situated, non-black persons for their electricity consumption.

## A.    Electricity Consumption Chart

The chart of the City residents' electrical usage does not provide sufficient information to determine which residents, if any, were similarly situated to plaintiff Freeman.  Many factors affect one's electric bill:  the home's size; the home's energy sources (e.g., gas, electric, solar, wood); the way that a home is built (e.g.,

7

the number of doors, windows, the type of insulation, whether the home faces east or south); the home's location (e.g., further north, at a higher elevation); how a home is occupied (e.g., seasonally, only on the weekends, only at night, all day); the number of residents; the appliances used in the home (e.g., heat pump versus furnace, electric versus gas water heater); the characteristics of those appliances (e.g., the appliances' ages, conditions, and efficiency ratings); efforts to conserve energy (e.g., programmable thermostats, turning off unused lights and appliances, maintaining lower thermostat settings in the winter or higher settings in the summer, using LED bulbs).  Freeman provided no evidence that the residents in the comparison chart had homes with similar energy consumption.

Moreover, even if the energy efficiency and consumption characteristics were similar across all residences in the City, the comparison chart does not compare electrical consumption for a specific time period or periods.  Thus, the energy consumption comparison does not account for such things as the specific weather conditions on a given day, week, or month.  Nor does the energy consumption comparison account for the season (e.g., winter versus spring).

Without some evidence that the comparison chart reflects a difference in electrical consumption for people who are similarly situated in all respects but their race, the comparison chart fails to establish a critical part of Freeman's federal

8

claims—namely, that Freeman is similarly situated to non-black persons who were not overcharged for their kilowatt-hours of electricity consumption.

## B.    National and State Data

For similar reasons, Freeman's evidence that the City's black residents consumed more electricity than the state and national averages does not satisfy the "similarly situated" element of her federal claims. Residents across Georgia are not similarly situated to the City's residents. Some Georgia residents live in the mountains; some live at the beach. Some live in sprawling estates; some live in studio apartments. Some use their homes seasonally; some reside in the same home all year. Other than their state of residence, Freeman provided no evidence that the "average" Georgia resident is similarly situated to the City's black residents in terms of electricity consumption.

For obvious reasons, the differences between the City's black residents' energy consumption and that of the "average" national resident are even greater, as the geography, weather, and energy sources vary greatly across the nation.

## C.    The City's Interrogatory Responses

The City's responses to Freeman's interrogatory requests also fail to establish the "similarly situated" elements of Freeman's federal claims. Freeman directed the Court to Interrogatory No. 4 and Interrogatory No. 12. In Interrogatory No. 4, Freeman asked for the addresses of all residents in two of the

9

City's four wards where the residents used 4,000 to 5,000 kilowatt-hours of electricity in any month between 2005 to 2010. The City stated that it could not produce the requested information without substantial expense because the City would have to contract with the software company that created the billing software to generate a program to retrieve the requested information.

In Interrogatory No. 12, Freeman asked the City to explain the process for recording residents' electricity consumption into the City's computer database. In response, the City stated that meter readers rotated through the City's four wards on a predetermined schedule (e.g., Ward 1 on the 1st of each month, Ward 2 on the 7th of each month, etc.). The City stated that, after completing their routes, the meter readers upload their readings to City Hall for billing.

These interrogatory responses establish very little. They certainly do not establish the "similarly situated" elements of Freeman's federal claims.

**D.     Plaintiff Freeman's Interrogatory Responses**

Plaintiff Freeman's responses to the City's interrogatory requests also fail to establish the "similarly situated" elements of Freeman's federal claims. Plaintiff Freeman's responses establish that (1) the City's electricity wards are divided predominantly along racial lines, (2) the "wards were established many years ago when [the City] established the utility service," (3) the City charges the same rate and fees to all residential customers, and (4) the City's computerized billing

program cannot differentiate between white and black residents.[3]  None of the facts from Freeman's interrogatory responses establish the "similarly situated" elements of Freeman's federal claims.

### E.    Wadley's Report

Roy Wadley's expert report relies on national and state energy consumption data and a comparison of fourteen electric bills from black and white residents in the City.  However, as with the consumption comparison chart and the state and national data, nothing in Wadley's report shows that the white comparators analyzed in his report were similarly situated to Freeman.  In fact, the comparison of City resident data is based on electric bills of black City residents from 2004, 2008, and 2010.  Yet, the data for the white resident comparators are based on energy consumed in 2005.  There is no evidence that weather conditions for these various dates—spanning many years—produced "similar" electricity consumption.  Nor is there any indication that the homes, living conditions, or energy use in those homes were similar in any way.

Notwithstanding these deficiencies in the national, state, and City comparisons, Wadley's report concludes that the disparities in the electric bills of the City's white and black residents are "evidence of discrimination."  While the

---

[3]The remainder of Freeman's interrogatory responses contains non-factual statements concerning the nature of Freeman's claims and allegations.

Court must view the evidence in plaintiff Freeman's favor at this summary judgment stage, the Court need not accept Wadley's legal conclusion because it is unsupported by the facts.  See Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value."); see also Hilburn v. Murata Electronics N. Am., Inc., 181 F.3d 1220, 1228 (11th Cir. 1999) ("[T]he absence of any specific facts which would substantiate [the expert's] conclusion deprives [her conclusions] of any probative value.").

### F.    Papillion's Report

As noted above, after investigating plaintiff Freeman's allegations of discrimination, HUD "determined that no reasonable cause exist[ed] to believe that a discriminatory housing practice ha[d] occurred."  Plaintiff Freeman's expert, Willis Papillion, issued a report stating that the HUD investigation was flawed for two reasons:

First, the HUD investigator allowed the City to choose the sample of electric bills analyzed by HUD, rather than using a randomly selected sample of electric bills.  Second, the HUD investigator misunderstood Freeman's claim.  Specifically, plaintiff Freeman alleged that the City overstated black residents' electricity consumption (e.g., number of kilowatt-hours consumed).  But, the HUD investigator investigated disparities in the rate charged to black residents (e.g., cost

12

per kilowatt-hour consumed).  Freeman agreed with the HUD investigator that black and non-black residents were charged the same rate for each kilowatt-hour consumed.  However, she alleged that the City inflated the amount of electricity that its black residents consumed, and, thus, the City forced black residents to pay higher electric bills than their non-black counterparts.

Even if Papillion's report could be used to demonstrate flaws in the HUD investigation, nothing in Papillion's report provides evidence that the City inflated the black residents' electricity consumption because of their race.  Nor does Papillion's report indicate that plaintiff Freeman was similarly situated to any non-black residents with respect to actual electricity consumption.

## G.    Edward Freeman's Affidavit

Edward Freeman[4] is a retired HUD specialist and a civil rights analyst.  His affidavit also challenged the HUD investigator's methodology and conclusion.  But, demonstrating flaws in the HUD investigator's methods does not establish plaintiff Freeman's causes of action.

In addition to challenging HUD's investigation, Edward Freeman's affidavit draws the legal conclusion that the City "gives preferential treatment to Caucasians and discriminates against African Americans who are similarly situated" through inflated electric bills.  But, as noted above, the Court does not accept legal

---

[4] It is unclear from the record whether plaintiff Freeman and Edward Freeman are related.

conclusions unsupported by the facts.  See Evers, 770 F.2d at 986; see also Hilburn, 181 F.3d at 1228 ("[T]he absence of any specific facts which would substantiate [the expert's] conclusion deprives [his conclusions] of any probative value.").  Notably, Edward Freeman's conclusion is based on the same evidence discussed above:  the consumption comparison chart, national and state averages of electricity consumption, and the City's interrogatory responses.  However, neither Edward Freeman nor plaintiff Freeman explained how this evidence satisfies the "similarly situated" requirements in plaintiff Freeman's federal claims.

## IV.    CONCLUSION

Without some evidence showing that the proffered comparators reflect similarly-situated persons who only differ by race, Freeman's §1983 and FHA federal claims fail as a matter of law.  See Sweet, 467 F.3d at 1318-19; Schwarz, 544 F.3d at 1216.  As Freeman concedes, her other causes of action are all predicated on the City's alleged race-based discrimination.  Without evidence of race-based discrimination, Freeman's state law claims also fail.

For these reasons, the district court's grant of the City's motion for summary judgment is affirmed.

**AFFIRMED**.

14